**Jerry B. BAKER, Appellant,**

v.

**Jim L. STORY, M. D., Appellee.**

No. 16435.

Court of Civil Appeals of Texas, San Antonio.

June 3, 1981.

Rehearing Denied Aug. 10, 1981.

Tuck R. Chapin, San Antonio, for appellant.

Kenneth L. Clark, David Stephenson, Huson, Clark, Hooks, Stephenson & O'Connor, San Antonio, for appellee.

OPINION

CADENA, Chief Justice.

In this medical malpractice suit the plaintiff, Jerry B. Baker, appeals from the action of the trial court in instructing a verdict in favor of the defendant, Dr. Jim L. Story.

Plaintiff was injured when he was shot in the leg. After pain persisted for several months he was examined by Dr. Charles Miller, who diagnosed his condition as causalgia, or pain resulting from damage to a nerve. At this time Dr. Miller was a member of the United States Air Force and was practicing at the University of Texas Health Science Center, a part of the University of Texas Medical School in San Antonio, under a rotating residency program involving the exchange of residents be-

tween the University of Texas Medical School facilities and the Air Force. Dr. Story was head of the neurological-surgery department at the medical school facility.

After consultation with Dr. Story, Dr. Miller recommended that plaintiff undergo a lumbarsympathectomy, a surgical procedure involving the excision of a two- or three-inch section of the sympathetic nerve. Plaintiff does not question the correctness of the diagnosis nor of the recommendation.

The operation was performed by Dr. Miller, who was not a specialist in neurosurgery, and who was performing his first sympathectomy as a resident. Dr. Story was a specialist in the field of neurosurgery.

During the operation Dr. Miller identified what appeared to him to be the sympathetic nerve chain. Upon instructions from Dr. Story, who also identified it as a nerve, Dr. Miller cut it. Immediately after the structure was cut it became apparent that Dr. Miller had cut the right ureter rather than the sympathetic nerve. Dr. Howard Radwin, a staff urologist, was immediately summoned and he repaired the damage by grafting the upper portion of the cut right ureter into the left ureter. After this had been accomplished, the sympathetic nerve chain was successfully identified and a section thereof was removed successfully, thus completing the intended surgical procedure. There were no ill effects resulting from the performance of the sympathectomy, but plaintiff developed urological problems requiring rehospitalization.

Before the case was submitted to the jury, defendant, Dr. Story, moved for an instructed verdict on the following grounds:

(1) Under the doctrine of collateral estoppel, plaintiff was bound by a finding, made in a prior suit in the United States District Court involving plaintiff's claim against Dr. Miller, that Dr. Miller had not been guilty of negligence.

(2) There was no evidence establishing a standard of care applicable to a practitioner of Dr. Story's status.

(3) The doctrine of sovereign immunity insulates Dr. Story from personal liability.

The trial court then directed the verdict in favor of defendant.

Plaintiff urges that the trial court erred in instructing a verdict in favor of defendant because the doctrine of collateral estoppel is not applicable, there was sufficient evidence to raise a question of fact concerning the applicable standard of care and defendant's failure to conform to such standard, and defendant is not protected by the doctrine of sovereign immunity.

*Collateral Estoppel*

Plaintiff first filed his suit for damages in a state district court against Dr. Miller and Dr. Story. He then filed a suit in the United States District Court, under the Federal Torts Claims Act, seeking to recover damages from the United States because of Dr. Miller's negligence. The federal case was tried first and resulted in a judgment that plaintiff take nothing, the court concluding that plaintiff had failed to establish that Dr. Miller was guilty of negligence. There was no appeal from this judgment.

After the judgment of the federal court became final, the state court rendered a summary judgment in favor of Dr. Miller and Dr. Story on the ground that plaintiff was bound by the determination in the federal case that Dr. Miller was not guilty of negligence.

Plaintiff appealed that decision and this Court held that the trial court had correctly granted summary judgment in favor of Dr. Miller but that the trial court had erred in granting the summary judgment in favor of Dr. Story because Dr. Story's negligence was not in issue in the federal court case. While we held that any claim of negligence on the part of Dr. Story which was derivative and based on Dr. Miller's alleged negligence was barred under the doctrine of collateral estoppel, we pointed out that in this case Dr. Story was also being sued for his own acts of negligence during the course of the operation on plaintiff. We affirmed the judgment in favor of Dr. Miller but reversed the judgment in favor of

Dr. Story and remanded the case to the trial court for trial on the merits. *Baker v. Story*, 564 S.W.2d 166 (Tex.Civ.App.—San Antonio 1978, no writ).

■ In this case plaintiff alleged that Dr. Story was negligent because (1) he delegated the surgery in question to an unskilled physician who did not properly perform the surgery involved; (2) he failed to perform the surgery himself; (3) he failed to properly supervise the performance of the surgery by Dr. Miller; (4) he failed to distinguish the difference between the ureter and the nerve ganglia; (5) he failed to see that Dr. Miller had located, and was about to cut, the ureter instead of the nerve ganglia; and (6) he directed Dr. Miller to cut the ureter.

It is clear that the alleged acts of personal negligence by Dr. Story were his own separate acts and that the alleged liability of Dr. Story was based on his own negligent conduct and was not based on any theory of his liability for the acts of Dr. Miller.

In order to succeed in his claim against the United States, plaintiff bore the burden of showing negligence on the part of Dr. Miller, the only federal employee involved in the operation. Any negligence on the part of Dr. Story was irrelevant to any issue involved in the suit against the United States, since there was no possibility of holding the United States liable for the negligence of Dr. Story.

We adhere to our holding in the former appeal of this case that the final judgment in plaintiff's suit against the United States, while it effectively precluded plaintiff from relitigating the question of Dr. Miller's negligence and insulated Dr. Story from any derivative liability based on alleged negligence by Dr. Miller, does not prevent plaintiff from litigating in a subsequent suit his claim against Dr. Story based on the personal negligence of Dr. Story.

### Standard of Care—Negligence

■ It was incumbent on plaintiff to demonstrate by expert testimony that Dr. Story was guilty of negligence. That is, he had the burden of introducing testimony through a medical expert to establish a standard of care so that the fact-finder could determine whether Dr. Story's conduct deviated from such standard so as to constitute negligence. *Wilson v. Scott*, 412 S.W.2d 299 (Tex.1967); *Smith v. Guthrie*, 557 S.W.2d 163 (Tex.Civ.App.—Forth Worth 1977, writ ref'd n.r.e.).

■ A nonspecialist, such as Dr. Miller was in the field of neurosurgery, is required to exercise only that degree of care and skill possessed by a general practitioner. On the other hand, a specialist will be held to a higher degree of care and skill than that possessed by a nonspecialist. The evidence in this case justifies the conclusion that Dr. Story was a specialist in the field of neurosurgery, so that he would be held to a higher standard than that which would be applied to Dr. Miller. *King v. Flamm*, 442 S.W.2d 679, 681 (Tex.1969); *Smith v. Guthrie, supra*, at 167.

■ In determining whether the trial court properly withdrew the case from the jury we must view the evidence in the light most favorable to plaintiff. This means that we must accept the evidence and the inferences which may be drawn from such evidence in the light most favorable to plaintiff, discarding all contrary evidence and inferences. *Triangle Motors of Dallas v. Richmond*, 152 Tex. 354, 258 S.W.2d 60 (1953).

The surgery was performed by Dr. Miller. He located what he thought was the sympathetic nerve chain and showed it to Dr. Story. Dr. Story instructed Dr. Miller to cut the structure and Dr. Miller did so. The mistake was discovered as soon as the structure was cut and Dr. Story then took over the surgical procedure, locating the nerve chain and cutting it.

The urologist who was summoned immediately to repair the damage to the ureter testified that the ureter which he repaired looked like a normal ureter and did not look like a nerve ganglion.

Dr. Story testified that if a surgeon located the ureter and the structure he located

looked like a ureter it would be a departure from standard medical practice for the surgeon, whose purpose was to cut a nerve ganglion, to cut the ureter.

While on the stand, Dr. Story testified as follows:

> Q All right. When you cut it, did it look like—when you cut it—examined it and cut the ureter, did it look like a ureter to you?
>
> A It must not have. It must have— when I cut it—or I didn't cut it, excuse me. Excuse me, when Dr. Miller cut it.
>
> Q When you looked at it and he cut it, it looked like a ureter to you then; didn't it?
>
> A It sure did.

■ Dr. Story's testimony is that it would be a deviation from standard medical practice for a surgeon, intending to cut a nerve ganglion, to cut a normal appearing ureter instead. Dr. Story testified that the time that Dr. Miller, acting on Dr. Story's instruction, cut the ureter it looked like a ureter to Dr. Story. It can, perhaps, be argued that Dr. Story became confused when he said the structure looked like a ureter, but it certainly was not the function of the trial court to interpret Dr. Story's testimony and, based on the court's interpretation, withdraw the case from the jury.

The testimony of the defendant doctor is clearly sufficient to establish the applicable medical standard of care. *Wilson v. Scott,* 412 S.W.2d 299 (Tex.1967). In this case the testimony of Dr. Story is clearly sufficient to, at least, raise an issue of fact concerning the applicable standard and the deviation from such standard.

■ There is testimony to the effect that, at the time it was cut, the ureter had rami-like filaments emanating from it and exhibited ganglial bulges, and that both the rami-like filaments and the ganglial bulges are characteristics of the sympathetic nerve chain. We cannot consider such testimony under the rule that only evidence favorable to the plaintiff may be considered. Since such testimony is clearly favorable to defendant and unfavorable to plaintiff, it must, under the applicable rule, be disregarded in determining whether the trial court correctly instructed a verdict in favor of defendant.

Defendant points out that the urologist, who testified that the ureter was normal in appearance, was not present at the time the ureter was mistakenly cut. Even if we disregard the testimony of the urologist, there is still Dr. Story's statement that at the time Dr. Miller cut the ureter it looked like a ureter. Dr. Story testified that the urologist was called in immediately, and there is nothing in the record to suggest that the insult to the ureter would have transformed it from the appearance of a nerve ganglion to that of a normal ureter. Even if such an inference could be drawn, the rules concerning the method of evaluating the evidence in case of an instructed verdict do not permit the inference.

There was some evidence, more than a scintilla, of the applicable standard of care and of a deviation from such standard.

### Sovereign Immunity

■ The instructed verdict cannot be upheld by relying on the doctrine of sovereign immunity. Historically, this doctrine, as its name implies, shields the sovereign from liability. Where the question concerns the liability of a governmental officer or employee, rather than the liability of the sovereign itself, the problem is one of official immunity, not of sovereign immunity. Whether public servants enjoy immunity from liability for their torts is a question distinct from that of the immunity of the sovereign itself.

It may be assumed, even though the assumption may be legitimately questioned, that granting immunity to some public officials is necessary in order to insure the effective administration of government. It can be argued that if administrative officials are held liable for their tortious conduct, the prudent would be reluctant to enter governmental service and even competent persons who entered public life would not be zealous in discharging their

duties. "The justification for [granting immunity] is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949).

Even if we accept the basic assumptions unquestioningly, it does not follow that all public servants should be granted immunity from liability for all departures from the standard of conduct applicable to ordinary persons unless the deviant conduct can be classified as malicious.

Although the leap from sovereign immunity to official immunity is sometimes made with an ease which may be disquieting to some, the Texas courts have not granted immunity to all public servants. The Texas courts, in granting immunity, have distinguished between judicial officers, quasi-judicial personnel and ministerial functionaries.

It is, perhaps not surprising that judges have eagerly granted themselves an immunity which is absolute so long as the conduct occurs under circumstances sufficient to clothe them with jurisdiction. *See Campbell v. Jones,* 153 Tex. 101, 264 S.W.2d 425, 427 (1954); W. Prosser, The Law of Torts § 132 (4th ed. 1971).

Where the public servant's status rises only to the level of a "quasi-judicial" position, he enjoys immunity as long as he acts in good faith within the scope of his authority. School trustees are classified as quasi-judicial officers and insulated from liability in the exercise of their powers except when they act "wilfully or maliciously." *Campbell v. Jones, supra,* at 427. In *Russell v. Edgewood Independent School District,* 406 S.W.2d 249, 252 (Tex.Civ.App. —San Antonio 1966, writ ref'd n.r.e.), the Court, relying on *Campbell* said that the cloak of immunity protected not only trustees, saying that "trustees and agents of a school district, while acting in such official

capacity, enjoy the same governmental immunity as does the school district." The actual holding was that the immunity extended to a school superintendent, although the Court added that such immunity disappeared in cases "which involve individual and separate torts, such as assault, trespass, fraud or conversion." Similar language, including the reference to the four torts enumerated in *Russell,* was used to protect a school superintendent in *Hix v. Tuloso-Midway Independent School District,* 489 S.W.2d 706, 712 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.). It is not clear whether the specification of the four torts in *Russell* and *Hix* was intended to be merely illustrative or whether it was meant to be exclusive.

In *Barr v. Bernhard,* 562 S.W.2d 844 (Tex. 1978), the Supreme Court, interpreting section 21.912 of the Texas Education Code in a manner rejected by two dissenting members of the Court, held that all professional employees of a school district were exempt from liability "for acts done within the scope of employment, and which involve the exercise of judgment or discretion, except in circumstances where, disciplining a student, the employee used excessive force or his negligence results in bodily injury to the student." 562 S.W.2d at 849.

In the absence of a statute similar to, and interpreted in the manner as section 21.912, it appears that teachers would be liable for their negligence. Seitz, *Legal Responsibility under Tort Law of School Personnel and School Districts as Regards Negligent Conduct Towards Pupils,* 15 Hastings L.J. 495 (1964). In *Sewell v. London,* 371 S.W.2d 426 (Tex.Civ.App.—Texarkana 1963, no writ), decided prior to the enactment of section 21.912, a teacher was held liable for negligence resulting in bodily injury to a student even though the negligent act was not connected with the disciplining of a student. *See* 78 C.J.S., *Schools and School Districts* § 238 (1952).

It appears, then, that in the absence of legislation such as that embodied in section 21.912, the liability of teachers for their negligence is not limited to situations where

the negligence occurs in the process of disciplining a student.

■ If the position held by the defendant public servant is classified as a "mere ministerial" post, he is liable for his tortious conduct to the same extent as a person who holds no government position. Thus, a police officer is liable for his negligent operation of a police vehicle while in the performance of his duty responding to a call. *Eubanks v. Wood*, 304 S.W.2d 567 (Tex.Civ. App.—Eastland 1957, writ ref'd n. r. e.). There are other examples where liability is imposed because the duties of the public servant are classified as ministerial. A clerk's duties are almost always held to be ministerial. *Benge v. Foster*, 47 S.W.2d 862 (Tex.Civ.App.—Amarillo 1932, writ ref'd). Jailers and sheriffs act ministerially in receiving and caring for prisoners, as do pound masters in receiving and caring for animals. *Browning v. Graves*, 152 S.W.2d 515, 519 (Tex.Civ.App.—Fort Worth 1941, writ ref'd); *Smith v. Arnold*, 251 S.W. 315 (Tex.Civ.App.—Beaumont 1923, no writ). The director of an insane asylum has been held to act ministerially when he acts with reference to the custody and disposition of money found on an inmate. *Worsham v. Votgsberger*, 60 Tex.Civ.App. 602, 129 S.W. 157 (Austin 1910, no writ).

The distinction between "quasi-judicial" and "ministerial" duties is not only a fine-spun distinction; it is, for practical purposes, unworkable. It is said that "quasi-judicial" acts are "discretionary" in character, requiring personal deliberation, decision and judgment, while "ministerial" acts require only obedience to orders, or the performance of a duty as to which the actor is left no choice of his own. "It seems almost impossible to draw any clear and definite line, since the distinction, if it exists, can be at most one of degree. 'It would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail.' " W. Prosser, *supra* at p. 990.

■ Dr. Story's motion for instructed verdict asserted that the evidence established that Dr. Story was an employee of the State of Texas and that at all times "material to this action" he was working within the course and scope of his employment with the State of Texas "and that any action against him individually is barred under the doctrine of sovereign immunity."

In *Morris v. Nowotny*, 323 S.W.2d 301, 311 (Tex.Civ.App.—Austin 1959, writ ref'd n. r. e.), the Court said, "Nor is it disputable that public officers are not liable to individuals for acts done within the scope of their public duties." In view of the cases already discussed, this statement is obviously too broad and, because of such overbreadth, is incorrect. The evidence showed that Dr. Story, as chairman of the department of neurosurgery, as part of his duties in that capacity, on occasions helped and was involved in the postgraduate training of resident physicians. There was no evidence suggesting the nature of the duties which, because of his position, he was required to perform on the occasions when he helped and was "involved" in such training. In order to uphold the instructed verdict on the ground of "sovereign immunity," it would be necessary to draw, from the meager evidence referred to in this paragraph, the inference that Dr. Story's duties required that he assist Dr. Miller in performing the operation on plaintiff. We may draw only such inferences as are favorable to plaintiff.

The evidence in this case does not establish as a matter of law the nature and extent of Dr. Story's duties. It does not establish, as a matter of law, that such duties were of a nature which must be classified as "quasi-judicial." Nor does it conclusively establish that Dr. Story's duties differed from those of an ordinary teacher who, in the absence of statutory provisions to the contrary, will be held liable for injuries resulting from his negligence.

In *Comley v. Emanuel Lutheran Charity Board*, 582 P.2d 443, 35 Or.App. 465 (1978), there is language to the effect that the

negligent acts of a medical doctor employed by the state do not involve matters of "governmental" discretion and that the alleged malpractice of such a doctor falls outside the immunity granted state employees in the performance of discretionary acts. We are not to be understood as holding that the rule applied in *Comley* and in other cases, such as *Madsen v. State*, 583 P.2d 92 (Utah 1978), which categorically impose liability for medical malpractice on doctors employed by the state medical facilities, represent the present state of Texas law. We do no more than hold that, under the evidence in this case, it was not conclusively established that Dr. Story was entitled to immunity as an employee of the State of Texas.

The judgment of the trial court is reversed and the cause is remanded to that court for further proceedings.