**Mark FONT, Appellant,**

**v.**

**Roy CARR, Appellee.**

**No. 01-92-01134-CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 16, 1993.

Rehearing Denied Jan. 13, 1994.

William J. Delmore, III, Houston, for appellant.

Roger Moore, Gray & Becker, P.C., Houston, for appellee.

Before COHEN, MIRABAL and PRICE,* JJ.

**OPINION**

COHEN, Justice.

This is an interlocutory appeal from the denial of a motion for summary judgment that asserted the defense of official immunity. TEX.R.APP.P. 42(a); TEX.CIV.PRAC. & REM. CODE ANN. § 51.014(5) (Vernon Supp.1993). When successfully invoked, an officer is immune from suit, not just from liability. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). The principal questions are 1) whether an assistant district attorney has absolute or qualified immunity when advising county officials about bail bondsmen, and 2) if the immunity is qualified, is subjective good faith required or must immunity be granted if the conduct is objectively reasonable. We hold that because the prosecutor's conduct here was not intimately bound up with the judicial process, he is not entitled to absolute immunity, but only to qualified immunity. We further hold that Texas law affords qualified immunity only to officials acting in actual good faith. Finally, we hold that the prosecutor's reliance on TEX.CODE CRIM.P.ANN. art. 17.14 (Vernon 1977) is not conclusive evidence that he acted in good faith because that article does not apply in Harris County or in any county that has a bail bond board under TEX.REV.CIV.STAT.ANN. art. 2372p–3 (Vernon Supp.1993).

## Facts [1]

Mark Font, appellant, is a Harris County assistant district attorney who handles bail bond forfeiture litigation. On December 20, 1991, Font appeared for trial on three forfeiture cases. The bonds totalled $100,000, and Roy Carr, appellee, was the surety. Font testified he did not then know who Carr was, and had no "personal beef" with him because Carr had conducted all previous business in an orderly manner.

In court on December 20, Carr's attorney, Harold Klein, handed Font a signed motion for continuance that stated:

> Movant would show that he has been very vigilant in attempting to locate this defen-

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

1. We review the record in the light most favorable to the nonmovant for summary judgment, Mr. Carr. All testimony referred to herein is from depositions and affidavits.

dant and return him to custody. That a continuance of these cases will not harm the Plaintiff [the State], however, a trial and judgment on all of these cases at this time will effectively put your Movant [Carr] out of his only business. Your Movant would alternatively request that if a continuance is not granted on all three cases, that it be granted on Case No. 530623–A which would allow him to continue in business and further his attempts to return this Defendant.

That document was never filed. A legislative continuance, however, was granted on different grounds urged by Carr's other attorney, Senfronia Thompson.

Over two months passed, and due to Thompson's unavailability, the trial judge granted other continuances, ultimately setting the cases for February 28, 1992. On that day, Thompson telephoned the presiding judge and was granted another continuance. Font, upset by what he perceived as abusive motions for continuances and Thompson's ex parte communication with the judge, told Carr, "I'm going to put an end to this bullshit. I'm going to put you out of business."

Font testified he was alarmed at Carr's precarious financial condition, specifically that Carr stated two months earlier in the unfiled December motion that he could not pay the three judgments on the bond and still remain in business. Font immediately investigated and discovered that Carr had written another $100,000 of bonds since December, the time he stated the adverse judgment would put him out of business. Font was concerned that Carr would be unable to satisfy any additional adverse judgments, yet was continuing to expand his potential liability to Harris County. Font wrote a letter the same day, February 28, 1992, to Sheriff Johnny Klevenhagen suggesting the sheriff exercise his discretion to require Carr to show additional proof of the sufficiency of the security offered by a bondsman, as permitted by Tex.Code Crim.P.Ann. art. 17.14 (Vernon 1977).[2]

The sheriff told his employees not to accept any more bonds from Carr until Carr showed he could cover the bonds. The sheriff testified he acted pursuant to article 17.14 and that he had taken similar action with other people on several previous occasions, including once within the previous month.

On March 2, 1992, the sheriff's office informed Carr of the decision to require proof of solvency. On March 3, 1992, the sheriff's office refused to accept a bond from Carr. On March 4, Carr spoke by telephone with the sheriff. The sheriff stated that unless Carr posted additional collateral, the sheriff would not accept any more bonds. The sheriff invited Carr to meet him and discuss the issue. No meeting took place, and on March 5, a judge issued a temporary restraining order preventing the sheriff from refusing to accept bonds from Carr.

Carr sued Klevenhagen and Font, seeking injunctive relief and damages for violations of article 1, § 19 of the Texas Constitution. *See Steele v. City of Houston,* 603 S.W.2d 786, 793 (Tex.1980); *Weyer v. Wegner,* 58 Tex. 539, 545 (1883); *Jones v. Memorial Hosp. Sys.,* 746 S.W.2d 891, 893–94 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Gold v. Campbell,* 117 S.W. 463, 468–69 (Tex.Civ.App.—1909, no writ) (all allowing recovery against public officials for violations of Texas Constitutional rights). The right to earn a living by writing bail bonds is a property interest protected by the Texas Constitution. *Smith v. Decker,* 158 Tex. 416, 312 S.W.2d 632, 633–34 (1958).

Font moved for summary judgment, claiming official immunity from suit. The trial judge denied the motion, and Font appealed.

The material facts are undisputed. Thus, Font must show he established his affirma-

2. Article 17.14 reads:
Such affidavit [filed by the surety on a bail bond] shall not be conclusive as to the sufficiency of the security; and if the court or the officer taking the bail bond is not fully satisfied as to the sufficiency of the security offered, further evidence shall be required before approving the same.
Tex.Code Crim.P.Ann. art. 17.14 (Vernon 1977).

tive defense of official immunity as a matter of law. Font claimed absolute immunity from the suit and alternatively, qualified immunity.

Absolute Immunity

In his first point of error, Font claims absolute immunity from suit for his actions as a prosecutor, relying on *Wyse v. Department of Public Safety,* 733 S.W.2d 224 (Tex. App.—Waco 1986, writ ref'd n.r.e.), and *Miller v. Curry,* 625 S.W.2d 84 (Tex.App.—Fort Worth 1981, writ ref'd n.r.e.), *cert denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). In *Wyse,* city police officers who were fired sued the district attorney, the sheriff, and two Texas Rangers, alleging tortious interference with business relations and invasion of privacy. The trial court granted summary judgment for the defendants based on official immunity, and the appeals court affirmed. 733 S.W.2d at 226. The *Wyse* court did not hold that the defendants were entitled to absolute immunity; rather, it stressed that the defendants acted in good faith. *Id.* at 227. Good faith is an element of qualified immunity. Thus, *Wyse* did not hold that prosecutors are entitled to absolute immunity.

In *Miller,* the children of two women who had been murdered, one by her husband and the other by her ex-husband, sued prosecutors under 42 U.S.C. § 1983, alleging failure to protect them from the killers. 625 S.W.2d at 84. The district court held the plaintiffs had failed to state a cause of action. *Id.* The appellate court affirmed, stating that "[t]here has long been a common law immunity for prosecutors from civil actions for malicious prosecution based on an indictment and prosecution which results in an acquittal of the accused." *Id.* at 86. The court concluded:

> The common-law immunity of a prosecutor is based upon the same considerations that underlie the common law immunities of judges and grand jurors acting within the scope of their duties. These include concerns that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.
>
> The same considerations of public policy that dictate the common-law rule also mandate and require absolute immunity under 42 U.S.C.A. § 1983. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 [1976].

*Id.* The *Miller* case thus established absolute prosecutorial immunity for decisions to prosecute or not prosecute criminal complaints. Such decisions are not involved here. Nevertheless, appellant contends that the same policy considerations supporting absolute immunity in *Miller* justify absolute immunity for *any* discretionary decisions made within the scope of a prosecutor's official responsibilities. Thus, Font argues, we should extend that absolute immunity.

Texas courts have extended absolute immunity only to judges, *Baker v. Story,* 621 S.W.2d 639, 644 (Tex.Civ.App.—San Antonio 1981, writ ref'd n.r.e.), and to some officials performing adjudicative functions. *See, e.g., Rains v. Simpson,* 50 Tex. 495, 502 (1878) (holding justices of the peace comprising county commissioner's court were absolutely immune for refusing to accept the sheriff's bond as *ex-officio* tax collector); *Sanders State Bank v. Hawkins,* 142 S.W. 84, 86 (Tex.Civ.App.—Texarkana 1911, no writ) (holding commissioner of insurance and banking and bank examiner were absolutely immune from suit because their closing of a bank was quasi-judicial discretionary action). Carr argues that prosecutors should not have absolute immunity beyond that in *Miller.*

Both *Wyse* and *Miller* relied on federal common law for authority. Federal case law recognizes "[t]he presumption ... that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed,* 500 U.S. 478, ——, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991). Moreover, the Supreme

Court has been "quite sparing" in granting absolute immunity. *Id.* The Court uses a "functional" approach to immunity issues. *Id.* It examines the nature of the defendant's official function and evaluates the effect that exposure to particular forms of liability would have on the appropriate exercise of that function. *See Mireles v. Waco,* ––– U.S. ––––, ––––, 112 S.Ct. 286, 288, 116 L.Ed.2d 9 (1991). The inquiry centers on the nature of the official behavior challenged, not on the officer's title or status. *Id.*

Prosecutors have absolute immunity when their "activities were intimately associated with the *judicial* phase of the criminal process." *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995 (emphasis added). The Court's holding was narrow: "We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. at 431, 96 S.Ct. at 995. Although the Court in *Imbler* left open the question whether absolute immunity would apply to "those aspects of the prosecutor's responsibility that would cast him in the role of an administrator or investigative officer rather than that of an advocate," 424 U.S. at 430–31, 96 S.Ct. at 995, the Court addressed those prosecutorial functions in *Burns v. Reed.*

In *Burns,* the Court held first that prosecutors are absolutely immune from liability for their participation in probable cause hearings, finding that "appearing before a judge and presenting evidence in support of a motion for a search warrant clearly involves the prosecutor's 'role as advocate for the State.'" 500 U.S. at ––––, 111 S.Ct. at 1942. The Court, however, rejected the argument that giving legal advice to a police officer is related to a prosecutor's case screening advocacy function, and held that absolute immunity does not extend to that act.[3] *Id.* In so holding, the Court emphasized that "[a]bsolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation," and that it applies "only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Id.* at ––––, 111 S.Ct. at 1943. The Court stated that, "Absent a tradition of immunity comparable to the common-law immunity from malicious prosecution which formed the basis for the decision in *Imbler,* [the Court has] not been inclined to extend absolute immunity...." *Id.* Moreover, the Court explained that "[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." *Id.* at ––––, 111 S.Ct. at 1944. The Court also rejected the government's argument that, as with the initiation of prosecutions, sufficient checks on prosecutorial misconduct already exist. The Court stated that, "one of the most important checks, the judicial process, will not necessarily restrain the out-of-court activities of a prosecutor that occur prior to the initiation of a prosecution...." *Id.* Finally, the Court also noted that even though giving legal advice to the police was a vital obligation of the prosecutor, qualified immunity provides ample protection for prosecutors giving legal advice. *Id.* The Court noted that the qualified immunity defense has evolved since *Imbler,* and it now provides "ample support to all but the plainly incompetent or those who knowingly violate the law. Although the absence of absolute immunity for the acts of giving legal advice may cause prosecutors to consider their advice more carefully, '[w]here an official could be expected to know that his conduct would violate statutory or constitutional rights, he should be made to hesitate.'" *Id.*

Font relies on two cases that extended absolute prosecutorial immunity outside the confines of a courtroom. *Johnson v. Kegans,* 870 F.2d 992, 996–98 (5th Cir.1989); *Bryen v. Becker,* 785 F.Supp. 484 (D.N.J.1991). In

3. The prosecutor in *Burns* told police they likely had probable cause to arrest the petitioner, Cathy Burns. 500 U.S. at ––––, 111 S.Ct. at 1937.

*Johnson,* a prosecutor's correspondence with the parole board about an inmate he had prosecuted was found to be "intimately associated with the judicial phase of the criminal process," and therefore protected by the absolute prosecutorial immunity set out in *Imbler. Johnson,* 870 F.2d at 996–98. The court reasoned that "judges, who impose sentences, and prosecutors, who best know the State's case against a defendant, have a continuing official interest in the execution of a sentence, due, no doubt, in part to their superior knowledge of the inmate and the crime for which he was convicted." *Id.* at 998.

Similarly, in *Bryen,* the court found IRS attorneys absolutely immune from suit for allegedly false statements to the plaintiff-accountants and their clients. 785 F.Supp. at 484–85. The court found that the letter, a settlement offer before agency adjudication, was " 'intimately associated with the judicial phase' of litigation." *Id.* at 487. The court reasoned that depriving a government attorney of absolute immunity when negotiating a settlement, but granting absolute immunity when bringing a case to trial would irrationally encourage government attorneys to bring cases to trial. *Id.*

■ Both *Johnson* and *Bryen* extended absolute immunity for prosecutors to certain activity outside the courtroom. Neither case, however, granted the blanket extension Font seeks here. Using the functional approach, those courts determined the official conduct was "intimately associated with the judicial phase" of litigation. We will apply the functional approach to Font's conduct to determine if absolute immunity is appropriate.

The Fifth Circuit recently applied the *Imbler* and *Burns* functional approach to decide the scope of immunity for a prosecutor giving local officials advice. *Hughes v. Tarrant County Texas,* 948 F.2d 918 (5th Cir.1991). In *Hughes,* a district attorney and his assistant were sued because of an opinion letter they sent to county commissioners. *Id.* at 919. The letter advised the commissioners court not to pay the legal expenses of a court clerk in a job-related contempt hearing, because doing so would violate the Local Government Code. *Id.* The clerk sued the prosecutors under section 1983, alleging deprivation of civil and constitutional rights. *Id.* The defendants moved for summary judgment, asserting absolute immunity. The trial judge denied the motion. *Id.* On appeal, the court held that *Burns* controlled the case:

> There is no historical or common law basis to extend absolute immunity to a district attorney when advising county officials. In addition, the risk of vexatious litigation arising from the district attorney's giving advice to county officials is not as great as the risk of vexatious litigation arising from the district attorney's role in initiating and prosecuting a case. *More importantly, litigation concerning a district attorney's advice to a county official does not interfere with the district attorney's conduct closely related to the judicial process.*

*Id.* at 921–22 (citations omitted) (emphasis added). The court held that the district attorney was not entitled to absolute immunity for giving legal advice to the commissioners court. *Id.* It concluded that qualified immunity provided prosecutors ample protection in this situation. *Id.* at 923 n. 3.

We conclude that *Burns* and *Hughes* control this case. Here, the prosecutor was sued because of legal advice to the sheriff. Under the functional approach in *Imbler* and *Burns,* prosecutors do not have absolute immunity when giving legal advice to public officials. *Hughes,* 948 F.2d at 921–22. We hold that qualified immunity is adequate protection for a prosecutor in these circumstances.

Finally, Font claims his membership on the Harris County Bail Bond Board is an independent basis for absolute immunity because that board performs a quasi-judicial role. *See Rains,* 50 Tex. at 502; *Sanders State Bank,* 142 S.W. at 86. The record does not establish that. Font testified that his actions were taken as a prosecutor, "wholly separate and apart" from any action by the

board. Thus, any immunity afforded a board member does not apply to him here.

We overrule point of error one.

### Qualified Immunity

■ In his second point of error, Font contends he conclusively proved the defense of qualified immunity.

The threshold question is what must a public official show to establish the defense of qualified immunity. Texas law and federal law differ in this respect. To establish qualified immunity in federal court, public officials need only meet a purely objective standard. They are not required to show subjective good faith. *Harlow v. Fitzgerald,* 457 U.S. 800, 815–20, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982). In Texas, however, qualified immunity is available for government employees who carry out the discretionary duties of their job in good faith, a subjective standard. *Campbell v. Jones,* 153 Tex. 101, 264 S.W.2d 425, 427 (1954); *Lazaro v. University of Texas Health Sciences Ctr.,* 830 S.W.2d 330, 332 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Baker,* 621 S.W.2d at 644. If Font's actual motive was bad faith hostility toward Carr or Carr's lawyer, then Font may be liable. *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2737 (citing federal common law before *Harlow* providing that malicious intent defeated claims of qualified immunity).

Font argues that Texas cases requiring "good faith" in qualified immunity cases were wrongly decided, and that public policy dictates we follow federal case law. We are bound to follow the law as declared by the Texas Supreme Court. Thus, we will review this summary judgment under the subjective standard that requires a showing a good faith.

### Determining Qualified Immunity

■ Qualified official immunity protects only public employees performing discretionary functions. *Baker,* 621 S.W.2d at 644. Ministerial duties are not shielded by official immunity. *Id.* Discretionary actions require personal deliberation, decision, and judgment, while ministerial actions require obedience to orders or the performance of a duty when the actor has no choice. *Wyse,* 733 S.W.2d at 227. Here, Mr. Font was plainly performing a discretionary duty. Thus, to enjoy qualified official immunity, he had to prove he acted in good faith. *Austin v. Hale,* 711 S.W.2d 64, 66 (Tex.App.—Waco 1986, no writ) (summary judgment affirmed where plaintiffs did not allege bad faith and there was no evidence of bad faith). Here, appellee alleged that Font acted in bad faith. Thus, the trial judge erred in denying the summary judgment only if appellant proved his good faith conclusively, as a matter of law. Tex.R.Civ.P. 166a(c).

Questions of "subjective intent" are "rarely" decided on summary judgment; that is a major reason why the federal courts abandoned the subjective standard. *Harlow,* 457 U.S. at 816–17, 102 S.Ct. at 2737–38; *Burns,* — U.S. at —, 111 S.Ct. at 1944 n. 8; *see Gonzalez v. Avalos,* 866 So.2d 346 (Tex. App.—El Paso 1993, n.w.h.) (Larsen, J., concurring). Here, Font's affidavit concerning his state of mind cannot be readily controverted; thus, it cannot support a summary judgment. *See Beaumont Enter. & Journal v. Smith,* 687 S.W.2d 729, 730 (Tex.1985).

■ Font argues that appellee's only evidence of bad faith is the fact that Font was angry, and mere anger does not necessarily establish bad faith. Carr, however, did not have to establish that Font acted in bad faith. The opposite is the case—Font had to prove that he acted in good faith. Official immunity is an affirmative defense, and we cannot shift the burden to the plaintiff to prove that the defendant acted in bad faith. *See Travis v. City of Mesquite,* 830 S.W.2d 94, 103 (Tex. 1992) (Cornyn, J., concurring). Here, Font knew of Carr's possible insolvency on December 20, 1991, but he did not act on it until February 28, 1992, when he became angry because of the additional continuance. In

light of this delay and his threat to put Carr out of business, he has failed to prove good faith as a matter of law. Tex.R.Civ.P. 166a(c). Under the subjective test for determining qualified immunity, denial of summary judgment was proper.

Even if Texas used the objective test for official immunity, Font would not be entitled to summary judgment. Under the objective test for good faith, government officials are presumed to act in good faith if their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818; 102 S.Ct. at 2738. Thus, in order to support a summary judgment, Font had to prove that, as a matter of law, his advice to the sheriff did not violate Carr's clearly established rights of which a reasonable person would have known. For reasons stated below, Font's reliance on article 17.14 was not shown to be, as a matter of law, a reasonable course of conduct.

Article 2372p–3 (the Act) is a comprehensive statutory regulatory scheme that applies to the business of writing bail bonds in counties that have a bail bond board. *Id.* § 1. Harris County is one of those counties. *Id.* § 3. The Act grants the bail bond board the exclusive power to supervise and regulate "all" phases of the bonding business. *Id.* § 5(f)(1). It grants no authority to the county sheriff.

Where the Act applies, only persons who are licensed under it may write bonds. *Id.* § 3(a). In order to be licensed, a person must meet the financial requirements set forth in section 6. Once a bondsman is licensed, the collateral he has posted limits both the total potential bond liability he may incur and the total liability of judgments nisi against him. *Id.* § 6(g). If the bondsman exceeds the specified ratios, he may not write any further bonds without reducing his liabilities or posting additional collateral. *Id.* If the ratios are not met, "the board *shall* immediately suspend the license while the violation continues," without prior notice or hearing, and "once the proper ratio is regained, the suspension *shall* be immediately lifted." *Id.* § 10(f) (emphasis added). Under the Act, only the board has these powers, not the sheriff.

The Act contains strong enforcement provisions to protect against insolvency. A bondsman's license may be suspended or revoked for insolvency. *Id.* § 9(b)(4). Suspension for insolvency requires the bail bond board to give notice of the charges, set a hearing, and give the bondsman an opportunity to be heard, to present witnesses on his behalf, and to question witnesses against him. *Id.* §§ 9(b), 10. Most important, the Act has, since 1981, provided that *"the sheriff shall accept or approve a bond posted by a licensed bondsman only in accordance with this Act and the rules prescribed by the board, but a sheriff may not refuse to accept a bail bond from a licensed bondsman who meets the requirements of Subdivision (4) or (5) of Subsection (a) of Section 6 of this Act."* *Id.* § 14 (emphasis added). Font never claimed that Carr failed to meet these or any other requirements of the Act.

The summary judgment evidence showed the following facts:

(1) Carr has been licensed by the Harris County Bail Bond Board continuously since 1982.

(2) On February 28, 1992, Font appeared in court seeking a final judgment in three cases in which Carr was surety on bail bonds which had forfeited. On that date, Carr's counsel obtained continuances on each case without filing a written motion.

(3) Font was upset with Carr's counsel because she was able to obtain these continuances.

(4) As he left the courtroom that day, Font said to Carr, "I'm going to put an end to this bullshit. I'm going to put you out of business."

(5) On that same day, Font wrote a letter to Sheriff Klevenhagen advising him to require Carr to furnish "additional evidence of the sufficiency of the security held by the County" before accepting any further bail bonds from Carr.

(6) Acting upon that letter, on March 2, 1992, Klevenhagen followed this advice and refused to accept any more bail bonds unless Carr gave him additional evidence of solvency, including the posting of additional collateral to secure his bonds.

(7) At the time of his actions, Font knew that Carr's bail bond license was in full force and effect, and knew that Carr was in compliance with the collateral-to-potential-liability and collateral-to-judgment-nisi-liability ratios permitted by article 2372p–3, § 6(g).

(8) At the time of his actions, Font was aware of that portion of article 2372p–3 that prohibits a sheriff from refusing to accept a bond tendered by a bondsman in compliance with the Act.

(9) At the time of his actions, Font knew that only the Harris County Bail Bond Board could suspend a bail bondsman's license for insolvency.

Notwithstanding Carr's admitted compliance with article 2372p–3, Font argues that the sheriff had the authority to question Carr's solvency under the provisions of article 17.14. This argument is contrary to our rules of statutory construction.

When several different statutes deal with the same general subject, they must be construed together and harmonized in order to give effect to all, if possible. *International Fidelity Ins. Co. v. Sheriff of Dallas County,* 476 S.W.2d 115, 118–19 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.). The legislature is presumed not to have enacted a statute that has no effect, and if two conflicting statutes cannot be reconciled and harmonized, the particular statute controls over the general. *Id.* The special statute will be considered an exception to the general statute, whether it was passed before or after the general statute. *Hallum v. Texas Liquor Control Bd.,* 166 S.W.2d 175, 177 (Tex.Civ.App.—Dallas 1942, writ ref'd).[4] Applying these rules to this case, we conclude that article 17.14 has no effect in Harris County; thus, the sheriff has no authority to question the solvency of a bail bondsman licensed in Harris County.

If article 17.14 gives the sheriff of a county in which article 2372p–3 applies the authority to question solvency even though the bondsman meets the financial requirements of article 2372p–3, then the Act is meaningless for that bondsman. Furthermore, although the Act specifies the financial requirements that a bondsman must meet, Font's interpretation would leave a sheriff free to impose additional, more burdensome requirements. Moreover, under Font's interpretation, the section 14 prohibition upon the sheriff's refusal to accept bonds tendered by licensed bondsmen would have no effect, making section 14 of the Act a nullity. In *Bexar County Bail Bond Board v. Deckard,* 604 S.W.2d 214, 217 (Tex.Civ.App.—San Antonio 1980, no writ), the court held that the board may not require more collateral from bondsmen than is required by article 2372p–3. If the board, of which the sheriff is only one member, cannot raise the Act's collateral requirements, we doubt that the sheriff acting alone may do so. That would give the sheriff more power than the board, which would be the opposite of the Act's intent. The amendatory act supports this conclusion by providing that, "the sheriff *shall* make any necessary transfers of property *and functions to the board* in accordance with the law as amended by . . . this Act." Act of August 31, 1981, 67th Leg., R.S., ch. 312, § 8, 1981 Tex.Gen.Laws 875, 886. (emphasis added). We conclude that the legislature intended to take these powers away from the sheriff and vest them in the board.

4. The Code Construction Act provides that when "statutes" are irreconcilable, the more recent statute prevails. Tex.Gov't Code Ann. § 311.-025(a) (Vernon 1988). The more recent statute is article 2372p–3. The Code Constriction Act does not apply here, however, because this case does not involve a code acted on by the 60th or a subsequent legislature, nor a repeal of a statute by a code nor a rule adopted under a code. Tex.Gov't Code Ann. § 311.002 (Vernon 1988). Article 17.14 of the Code of Criminal Procedure was enacted by the 59th Legislature. Act of January 1, 1966, 59th Leg., R.S., ch. 722, § 1, 1965 Tex.Gen.Laws 317, 377.

The only way to give effect to both of these conflicting statutes is to hold that in the counties where it applies, article 2372p–3 controls. When a bondsman has met its requirements, a sheriff may not question his solvency or refuse his bonds *Id.* § 14.[5] In counties where the Act does not apply, article 17.14 applies because there is no other regulatory scheme or regulatory body for bail bondsmen.

Article 2372p–3 is the more particular statute. It applies only in counties that have a bail bond board, while article 17.14 applied in every Texas county before the legislature enacted article 2372p–3. Thus, article 2372p–3 controls when in conflict with the more general regulatory provisions of the Code of Criminal Procedure. *International Fidelity Ins. Co.,* 476 S.W.2d at 118–20.

The Act's history also buttresses our conclusion. The 1973 enactment of the Act specifically allowed sheriffs to refuse bonds if they doubted the security was sufficient. *Klevenhagen v. International Fidelity Ins. Co.,* 861 S.W.2d 13, 17–18 (Tex.App.—Houston [1st Dist.] 1993, no writ); Act of August 27, 1973, 63rd Leg., R.S., ch. 550, §§ 4 & 7(b), 1973 Tex.Gen.Laws 1520, 1521 & 1524. The 1981 amendments deleted these provisions from the Act, leaving the Board in control.

The legislature has enacted a comprehensive regulatory scheme for bail bondsmen in the counties where it applies. This scheme sets out the financial requirements to be licensed. It provides that a sheriff may not refuse a bond from a bondsman who is in compliance with the Act. Finally, it sets out a comprehensive procedure for action by the board when a bondsman's solvency is in question. Determination of solvency is a function the Act assigns exclusively to the board, not to the sheriff. In the counties where article 2372p–3 applies, it controls over the more general provisions of article 17.14. We conclude that article 2372p–3 describes the only method by which a bondsman's right to execute bonds may be suspended due to insolvency.[6]

Because the summary judgment proof shows Font knew of this procedure but urged Sheriff Klevenhagen not to follow it, there is a fact issue even under the objective test. Font's reliance on article 17.14 is not objectively reasonable after the enactment of article 2372p–3 and his knowledge of it. A rational jury could find that Font's advice that Sheriff Klevenhagen bypass the Act and rely instead on article 17.14 was not reasonable because a public official in Font's position should have known that such action would deprive Carr of clearly established statutory rights. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Even under the objective test for good faith, Font has not proved conclusively that he is entitled to qualified immunity. The trial court properly denied the motion.

Point of error two is overruled.

The judgment is affirmed.

5. In *Burns v. Harris County Bail Bond Board,* 663 S.W.2d 615, 617 (Tex.App.—Houston [1st Dist.] 1983, no writ), this Court reached a decision arguably opposite of our conclusion in this case. That case is distinguishable in two ways. First, the issue was whether the sheriff *and* the bail board could refuse to accept bonds. *Id.* at 616. This case involves the right of the sheriff, acting alone, to refuse to accept bonds. Second, the opinion completely failed to mention section 14 of the Act, which specifically prohibits the sheriff from refusing bonds from a bondsman in compliance with the Act. Because the *Burns* opinion did not construe section 14, the part of the statute that we rely on most heavily today, *Burns* does not control the present case.

6. These same principles of statutory construction guided the court in *International Fidelity Insurance Co.* to hold that the comprehensive regulatory scheme in the Insurance Code prevailed over the more general Code of Criminal Procedure article 17.13, which purported to grant sheriffs a similar power to question the sufficiency of collateral posted by corporate sureties. 476 S.W.2d at 118–20.