

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| SCOTT TIDWELL, | § | No. 08-11-00322-CR |
| Appellant, | § | Appeal from |
| v. | § | 109th District Court |
| THE STATE OF TEXAS, | § | of Winkler County, Texas |
| Appellee. | § | (TC # 5191) |

§

§

§

§

§

§

§

## **O P I N I O N**

Scott Tidwell appeals his convictions of misuse of official information (Counts 1 and 2), retaliation (Counts 3 and 4), and official oppression (Counts 5 and 6). After a jury found Appellant guilty of each count, the trial court assessed punishment at imprisonment for ten years, probated for ten years, and a fine of $4,000 for Counts 1, 2, 3, and 4, and confinement for 120 days for Counts 5 and 6. For the reasons that follow, we affirm.

### FACTUAL SUMMARY

Tidwell's convictions are based on conduct which occurred during the investigation and criminal prosecution of two nurses, Anne Mitchell and Vickilyn Galle, for filing complaints with the Texas Medical Board against Dr. Rolando Arafiles. In related cases, the Winkler County Sheriff and a hospital administrator were also charged and convicted. The hospital administrator entered a negotiated plea of guilty and testified against Tidwell. Because Tidwell challenges the

legal sufficiency of the evidence supporting his convictions, we will set forth a detailed account of the underlying facts.

*The Hospital, the Administrator, and the Medical Personnel*

Winkler County Memorial Hospital in Kermit consists of a family clinic[1], emergency department (ED), and nineteen beds for in-patients, but it does not house an operating room or surgery unit. It is a critical access hospital and surgical procedures are not performed.

Naomi Warren was a nurse practitioner who worked in the clinic portion of the Hospital. Stan Wiley became the administrator of the Hospital in January 2007. Anne Mitchell has been a registered nurse since 1981 and she was working at the Hospital in an administrative role when Wiley became the administrator. As the Hospital's Compliance Officer, Mitchell's duties included medical staff credentialing. Vickilyn Galle is a registered nurse who was employed at Memorial Hospital from 1994 until 2009. She was the Quality Assessment Performance Improvement Coordinator, but she and Mitchell shared other duties including those of the Medical Staff Coordinator. As part of their regular duties, Galle reviewed all inpatient admissions and Mitchell reviewed the majority of the emergency room visits.

In January 2007, Memorial Hospital had only two doctors, Suirta and Nuraj Choudhary, a husband and wife team. A third doctor, Dr. Khoa Pham, began working at the Hospital in July 2007. The Choudharys moved to Houston in late 2007 leaving Dr. Pham as the sole physician. Dr. Pham became the medical director. Wiley recruited Dr. Rolando Arafiles who was practicing emergency room medicine in Monahans. Wiley informed the Hospital's board and the County Commissioners that Dr. Arafiles' medical license was restricted as the result of a sanction imposed by the Texas Medical Board (TMB), but he recommended that the Board hire

---

[1] The clinic portion of the facility is known as the Winkler County Rural Health Clinic.

Dr. Arafiles.[2] The Board hired Dr. Arafiles despite the restriction. A few months later, the Board hired a third doctor recruited by Wiley, Dr. Kenneth Winton.

*Concerns with Dr. Arafiles*

Mitchell, Galle, and Warren began having concerns about Dr. Arafiles shortly after he began practicing at the Hospital. As part of her regular duties, Mitchell checked his credentials and became aware that he could not supervise nurse practitioners as the result of the sanction imposed by the TMB. The restriction on his license concerned Mitchell because the bylaws of the Hospital provided that a physician with a restricted license could not be on the active medical staff. Prior to Dr. Winton being hired, Dr. Pham was the only physician who could supervise Naomi Warren, the nurse practitioner who practiced at the Rural Health Clinic, and if he was on vacation or out of town, she would be unable to treat patients.

Mitchell's duties included reviewing records from the ED for compliance with the standard of care. Some cases were automatically routed to her for review by the medical records department. These were cases where a patient was transferred, where a patient left against medical advice, and where the patient returned to the ED within a certain period of time. Other cases would be routed to her or Galle if staff spotted a matter of concern. Several cases were routed to Mitchell for her review concerning patients Dr. Arafiles saw in the ED during his six month provisional period. In September 2008, Mitchell became concerned because Dr. Arafiles had performed surgeries in the ED. In one case, a patient presented at the ED with an injured hand. Dr. Arafiles removed skin from the patient's abdomen and grafted it onto the injured area of the hand. This constituted a non-emergency surgical procedure. Another patient had a crush-type injury to a finger. Dr. Arafiles sewed a piece of rubber resembling a thimble onto the tip of the patient's finger. A third patient had injured a toe by dropping a heavy object onto it.

---

[2] The TMB restricted Dr. Arafiles' license in February 2007 for a three-year period.

Dr. Arafiles stabilized the toe by inserting a needle into the bone. This constituted a surgical procedure which should have been performed by an orthopedic surgeon.

Galle's duties included review of the in-patient cases. She was also responsible for sending medical records out for peer review through the Texas A&M RCHI[3] program. She began noticing a recurring problem whereby Dr. Arafiles would diagnose and admit a patient to the Hospital even though the diagnosis was not supported by the appropriate criteria and medical documentation. When this occurred, Galle took action to obtain the necessary documentation, including requesting it from Dr. Arafiles. If she did not obtain the documentation necessary to support the diagnosis, she would request that the patient be downgraded to a 24-hour observation. Galle also became concerned that Dr. Arafiles had not followed the standard of care in some cases and he had performed surgical procedures, including a skin graft, in the ED.

In September 2008, Wiley became aware of the surgical procedures performed by Dr. Arafiles in the ED, including the skin graft. The Hospital's insurance would not cover any surgical procedures so this presented risk and liability issues which concerned Wiley. Consequently, Wiley instructed Mitchell to pull the patient records and meet with the assistant director of nursing, Donna Paehl, to determine what had happened. On September 30, Wiley sent an email to Drs. Arafiles, Pham, and Winton reminding them that they could not perform any surgical procedures either at the ED, clinic, or at a patient's home. Wiley mentioned home visits in the email because Dr. Arafiles had expressed a willingness to make home visits.

*The Nurses' and Dr. Pham's Efforts to Address Standards of Care*

A medical staff meeting took place on October 8, 2008. It was attended by Wiley, Galle, Mitchell, Warren, and Drs. Pham, Arafiles, and Winton. At these meetings, Galle and Mitchell would typically discuss "write-ups" based on their review of the patient charts. Galle would also

---

[3] RCHI is an acronym for Rural and Community Health Institute.

discuss the files submitted to the RCHI peer review program. At this particular meeting, the group discussed not performing surgical procedures at home, the clinic, or ED. Galle also attempted to address her concerns about Dr. Arafiles not following the standard of care, but Wiley stopped her. He announced that Dr. Pham had set a meeting for October 16 and they would discuss standards of care at that meeting. Galle was aware that Dr. Pham had called for the meeting on October 16 and knew that she had not been invited to attend. Immediately after the October 8 meeting, Wiley called Galle into his office and instructed her to not send the medical records to RCHI for peer review and he would let her know when she could resume the practice. Wiley made it clear there would be no discussion about the decision. Galle, however, had left the files at the Medical Records Department prior to her meeting with Wiley and they had already been placed in the mail. Galle was concerned that she would be fired so she called RCHI, and after some discussion, she instructed RCHI to shred the files when they were received.[4] Dr. Pham had called for the October 16 meeting to discuss procedures in the ED after seeing the patient with the skin graft and determining that the skin graft had failed.[5] He also had concerns over Dr. Arafiles' treatment of patients with hypothyroidism. The meeting did not occur because Wiley canceled it. Dr. Pham testified it was inappropriate for Wiley to cancel the meeting. Wiley explained that he canceled the meeting because he had met with Dr. Arafiles after the October 8 meeting and had asked him to leave the Hospital. Dr. Arafiles was unhappy with Wiley's request and told him that he was going to hire a lawyer. Wiley consulted with

---

[4] These were not the original documents from the files but were copies.

[5] The seventy-five-year-old patient was diabetic and the skin graft became infected. Dr. Arafiles told the patient that the skin graft looked "great" at a follow-up visit even thought it was black and looked "horrible" to the patient. The patient returned to the Hospital the following day and saw Dr. Pham who sent him to a plastic surgeon in Odessa.

Tidwell, who was the county attorney and also served as the hospital's attorney. He also informed Tidwell about the problems discussed at the October medical staff meeting.

Galle intended to address her concerns at the medical staff meeting in November since they had not been addressed in October. Wiley determined that there would be a regular staff meeting in November as well as a separate "doctors only" meeting to discuss the concerns they had with each other's treatment of patients. Both meetings were scheduled, but the regular medical staff meeting was canceled.

The only meeting which took place in December 2008 was a meeting to determine whether Drs. Arafiles and Winton would be given full medical privileges at the Hospital. Dr. Pham told Wiley prior to the meeting that he did not want to give Dr. Arafiles full medical privileges because of his concerns about the procedures in the ER. He preferred to give Dr. Winton full medical privileges first and then he and Dr. Winton could decide together after a few months whether Dr. Arafiles should be given full medical privileges. When Wiley would not agree with Dr. Pham's recommendation, Dr. Pham told him that he did not want to work at the Hospital anymore because Wiley was preventing him from performing his duties as the medical director. Wiley told Dr. Pham that he would release him from his contract only if he voted to give Dr. Arafiles full medical privileges. Dr. Pham reluctantly agreed and he voted to give Dr. Arafiles full medical privileges, but the Board of Control refused to release Dr. Pham from his contract.

Members of the public and various officials, including Tidwell, attended a meeting of the Hospital's Board of Control in January 2009. Naomi Warren addressed the Board regarding some of the issues which the nurses had unsuccessfully attempted to raise at the October 2008 medical staff meeting. Warren informed the Hospital Board that Wiley had told the staff in

December 2008 that no chart review or reports to any compliance entity could be sent without first going through medical staff, administration, and the Board of Control, and she requested that the Board restore the mechanisms that allowed efficient non-biased review of records. Dr. Pham addressed several issues including his conflict with Wiley and the conflicts between the doctors with respect to patient care. Drs. Arafiles and Winton did not attend the meeting. The Board of Control's response was to instruct Tidwell to find someone who could mediate the doctors' problems with each other.

In apparent response to the issues raised at the Board of Control meeting, Wiley sent an email to the Hospital's physicians and to the nurses, including Mitchell, Warren, and Galle, apologizing for canceling the October 16 meeting called by Dr. Pham. He also requested that they "reactivate any and every patient care action that you may have stopped." Wiley informed them that only the doctors would attend the Medical Staff Meetings in the future.

In February or March 2009, the Hospital developed a new procedure for external peer review whereby the doctors were allowed to vote whether the selected files could be sent to RCHI. Galle selected a total of six files (two files for each doctor) and left them for their review. Dr. Pham voted that all of the files could be sent, but Dr. Winton voted against peer review on all of them. Dr. Arafiles did not vote but instead went into Wiley's office. Wiley subsequently removed the files and told Galle she could not send any of them to RCHI.

*Nurses File Complaints with the TMB*

Warren had quit working for the Hospital shortly after the January Board meeting. Mitchell and Galle were not satisfied with the resolution of the issues at the Hospital, and they had conversations about filing a complaint with the TMB. They had also been talking with Warren about filing a complaint. Mitchell and Galle decided to file a complaint with the TMB.

Galle provided some of the information included in the complaint but Mitchell drafted and typed it. Mitchell and Galle submitted the complaint anonymously because they both feared losing their jobs. Mitchell mailed the anonymous complaint to the TMB along with a complaint prepared by Warren. Mitchell did not have any knowledge about the patients referenced in Warren's complaint.

The anonymous complaint, filed at the TMB on April 13, 2009, informed the TMB that the Hospital's administration, with the approval of Board of Control, had approved a policy of "self review" and had prohibited reporting of any concerns to any board or agency without first notifying the administrator, physicians, and the Board of Control of the intent to report. The complaint identified six cases which concerned them. The complaint also stated that Dr. Arafiles emailed patients seen in the clinic about herbal medicines he sold outside of the hospital setting. This was prohibited by the Hospital's bylaws and rules. The report included the issue of Dr. Arafiles being given active medical staff privileges even though the Hospital's bylaws provided that privileges could only be given to a physician with an unrestricted license. Galle and Mitchell also included in the complaint that Wiley had instructed Utilization Management (Galle) that records could not be sent for external peer review. The report informed the TMB that the efforts of some of the physicians and staff to address these concerns internally had been blocked by the Hospital's administrator. The author described herself as a female who was over fifty years of age and stated that she was making the report anonymously because she feared Wiley would fire her. That concern proved to be well-founded.

Warren's complaint stated that she had worked with Dr. Arafiles at the Winkler County Rural Health Clinic from May 2008 through February 2009. She resigned her position after thirteen years because the standard of care was repeatedly not followed and her efforts to resolve

the problems internally were thwarted by Wiley and the Board of Control. Warren's report detailed five patient cases which concerned her. Dr. Arafiles prescribed armour thyroid for three patients but he failed to order appropriate lab work. One of those patients did not have baseline lab work done before Dr. Arafiles put her on armour thyroid. Another patient went to see a different provider and lab work revealed that her TSH was zero with a very elevated T4. The third patient had a severely elevated TSH after two months. A fourth patient who saw Dr. Arafiles was a Type 1 diabetic but he never ordered any lab work in the six months he managed her care. A fifth patient saw Dr. Arafiles for an ear ache but the doctor refused to see him until he had completed lab work. The patient complied but Dr. Arafiles did not notify the patient of the lab results or ever check his ear. Warren also reported to the TMB that Dr. Arafiles is a distributor of an herbal drink and he would give samples of the drink to his patients, telling them it was beneficial for fever, heart disease, arthritis, and any other ailment. He encouraged patients to go to a website or call his wife to purchase the herbal drink.

On April 15, 2009, the TMB sent a letter to Dr. Arafiles informing him that a complaint had been filed against him. The complaint generally described the allegations and provided him with the names of the patients related to the allegations, but it did not identify the author of the complaint.

*Wiley's Response to the TMB Complaints*

Wiley became aware that a complaint had been filed against Dr. Arafiles because the doctor requested copies of the patient files in question. The TMB also sent a subpoena for the records. Wiley testified that the request from the TMB "looked very serious" so rather than sending the files to the TMB, Wiley instructed Mitchell to meet with Tidwell and determine what the TMB wanted. Wiley admitted that he had responded to requests from the TMB for patient

- 9 -

files in the past and had not discussed the request with the county attorney before complying. Mitchell did not take the files to Tidwell. On April 29, 2009, Wiley provided Sheriff Roberts with a list of twenty-one Hospital employees who had access to patient health information in the Winkler County Rural Health Clinic from April 1, 2008 to the date of the letter. Wiley also provided a room at the hospital for Sheriff Roberts to use when questioning the employees to determine who had filed the complaint against Dr. Arafiles.

*Dr. Arafiles Obtains Assistance from Roberts and Tidwell*

Sheriff Roberts knew Dr. Arafiles personally and had played golf with him once or twice. He was also Dr. Arafiles' patient. Sheriff Roberts suffered a heart attack on August 8, 2008 and credited Dr. Arafiles with saving his life. It was well known that Sheriff Roberts thought highly of Dr. Arafiles. The president of the Hospital Board of Control called Sheriff Roberts in January 2009 and told him that "there was a move to get Dr. Arafiles fired" and he invited Roberts to attend the Board meeting and speak on his behalf. Sheriff Roberts attended the meeting.

Dr. Arafiles went to the Sheriffs' Department on April 27, 2009 to file a harassment complaint. He provided Sheriff Roberts with a copy of the letter from the TMB and told him that the cases referenced in the letter had already been addressed "three times" and this was a malicious attempt to damage his reputation in the medical community. Over the next several days, Sheriff Roberts contacted the patients identified in the letter and determined that none of them had filed the complaint. After eliminating the patients as the source of the complaint, Sheriff Roberts knew the complainant had to be someone with access to the medical records. Consequently, he contacted Wiley who told him that only a limited number of employees had access to the patient files. Wiley escorted Sheriff Roberts to the records department and the medical records custodian gave him a list of twenty-one employees who had access to the

records.

In early May 2009, Sheriff Roberts called the TMB and asked for a copy of the complaint filed against Dr. Arafiles. He was surprised to learn that the complaint was anonymous and that the TMB accepted anonymous complaints. Sheriff Roberts subsequently made a written request for the complaint. In his letter to the director of the TMB, Sheriff Roberts stated that he was conducting an investigation for the offenses of harassment[6] and misuse of official information[7] related to the complaint filed against Dr. Arafiles. He requested that the TMB provide him with a copy of the complaint to assist in his investigation. TMB complied with the request but set forth the text of Section 164.007(h) in the letter. That statute provides that:

> The board shall cooperate with and assist a law enforcement agency conducting a criminal investigation of a license holder by providing information that is relevant to the criminal investigation to the investigating agency. Information disclosed by the board to an investigative agency remains confidential and may not be disclosed by the investigating agency except as necessary to further the investigation.[8]

The letter also stated that the TMB understood that Sheriff Roberts was "conducting a criminal investigation of a license holder of the TMB" and he agreed to maintain the confidentiality of the complaint. The TMB cautioned Sheriff Roberts that if these assumptions were incorrect, he was to notify the TMB immediately because it was not otherwise authorized to provide the confidential information to him.

---

[6] A person commits the offense of harassment if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, he conveys, in a matter reasonably likely to alarm the person receiving the report, a false report, which is known by the conveyor to be false, that another person has suffered death or serious bodily injury. TEX.PENAL CODE ANN. § 42.07(a)(3)(West 2011). Sheriff Roberts testified at trial that a person could be charged with harassment under Section 42.07(a)(3) for simply conveying a report that another person has suffered death or serious bodily injury and it was not necessary to prove that the report was false or that the conveyor knew the report was false. It was with this faulty understanding of the harassment statute that he pursued the investigation of Mitchell and Galle.

[7] Sheriff Roberts testified that it was Tidwell who concluded that the nurses' conduct in filing the complaint with the TMB amounted to misuse of official information. This evidence permitted the jury to conclude that Tidwell participated in obtaining the complaints from the TMB.

[8] TEX.OCCUP.CODE ANN. § 164.007(h)(West 2012).

Sheriff Roberts received the cover letter from the TMB addressed to him and a copy of the actual complaints from the TMB. He reviewed the letter, including the TMB's statements of its assumptions. Sheriff Roberts testified that he thought all medical personnel, including nurses, were license holders of the TMB. Roberts also reviewed the complaint signed by Naomi Warren and concluded that she had not done anything wrong because she had signed it and she did not have anything against Dr. Arafiles. Despite being told by the TMB that a complaint could be filed anonymously, Sheriff Roberts believed the act of filing an anonymous complaint showed that the author had "malicious intent," and he began the process of identifying the author. Sheriff Roberts had initially identified Dr. Pham as his "number one suspect," but he used the complaint to immediately narrow the list of suspects to Mitchell or Galle because they were the only employees who were female and over fifty years of age. Sheriff Roberts and Deputy James Swanson interviewed Galle and Mitchell separately on May 19, 2009. Initially, Sheriff Roberts questioned them about the Hospital's policies and procedures for filing complaints. Later during each interview, Sheriff Roberts read each of them the *Miranda* warnings and stated he wanted to talk about a criminal complaint of harassment. Each of them invoked the Fifth Amendment right to counsel and the interviews were terminated.

Sheriff Roberts and Deputy Swanson consulted with Tidwell during the course of this investigation. They met with Tidwell after the interviews with Mitchell and Galle to brief him. Tidwell instructed Swanson to obtain a search warrant for the computers used by Mitchell and Galle. Tidwell assisted Swanson in drafting the search warrant affidavit. A judge signed the search warrant and Swanson executed it that same night, May 19. The following morning, law enforcement personnel found files on Mitchell's computer matching the anonymous complaint filed with the TMB.

The TMB went to Kermit during the course of Sheriff Roberts' investigation and obtained the medical files. It also requested that Sheriff Roberts provide a copy of his file. In the latter part of May 2009, Sheriff Roberts sent a copy of his file and informed the TMB that the case "ha[d] been filed with the Winkler County Attorney with a charge of Harassment, PC 42.07 A3." The letter is date-stamped "May 27, 2009" by the TMB. On May 27, 2009, Galle and Mitchell, accompanied by their attorneys, went to the Sheriff's Office and spoke with Sheriff Roberts and Deputy Swanson. One of the attorneys, Brian Carney, told Sheriff Roberts that Galle had been involved in making the anonymous report to the TMB. Galle and Mitchell also provided a written report to the Sheriff that the Hospital was accepting Medicaid funding it was not entitled to receive based on the criteria. The report implicated Wiley. Mitchell had been speaking with someone at the Medicaid program about the issue. Sheriff Roberts did not ask them any questions because "[he] had everything [he] needed."

### The Nurses are Fired

Shortly after Roberts' meeting with Galle and Mitchell, Tidwell informed Wiley that Mitchell had filed an anonymous complaint with the TMB against Dr. Arafiles with respect to ten patients, and Wiley spoke to Tidwell about firing her. In that same conversation, Tidwell told Wiley that Mitchell and Galle had made a report against him for Medicare fraud.

Wiley testified that Tidwell called the Texas Association of Counties[9] for advice during this meeting. Diana Cecil, a TAC employee, spoke with Tidwell. She prepared field notes of her telephone conversation. According to those notes, Tidwell called her to discuss "two problem employees" from the Winkler County Hospital who had made complaints against a doctor through official channels. She advised Tidwell that this could be a whistleblower case

---

[9] The Texas Association of Counties is a non-profit organization which provides a variety of services for Texas counties.

- 13 -

and to immediately contact "TAC legal" for legal guidance. Cecil also told him that "no harm" should come to the two employees for making the complaints.

At the conclusion of the meeting, Tidwell told Wiley that he could fire Mitchell even though she was a "whistleblower" if Wiley believed she submitted the complaint to the TMB in bad faith. Tidwell left it up to Wiley to determine whether it had been done in bad faith. Wiley fired Mitchell and Galle on June 1, 2009. The termination form presented to each nurse stated, "Your services are no longer required." Wiley did not tell either nurse the basis for termination. He told the jury that he fired Mitchell for filing the report with the TMB. He had concluded Mitchell had acted in bad faith by the report and it was his belief she just wanted to get rid of Dr. Arafiles. Wiley fired Galle because she refused to work with Dr. Arafiles and she had insisted on outside peer review of the Hospital's cases.[10] Wiley admitted that he had instructed Galle to not send charts for outside peer review.

### The Nurses are Indicted

Sheriff Roberts took his report and the evidence over to Tidwell's office and they reviewed everything together. When Tidwell indicated that the case fit misuse of official information, a felony, they went to the District Attorney's Office and spoke with Mike Fostel. Sheriff Roberts gave his report to Fostel and informed him that the only evidence they had against Galle was her lawyer's statement that both Mitchell and Galle had filed the anonymous complaint. Fostel and Tidwell were present when Sheriff Roberts presented the case to the grand jury. Tidwell also helped Fostel's administrative assistant, Joann Lujan, draft the indictments. On June 11, 2009, ten days after Mitchell and Galle were fired, a Winkler County grand jury returned indictments against Mitchell and Galle for misuse of official information, a third degree

---

[10] Galle expressly denied ever refusing to work with Dr. Arafiles.

felony. *See* TEX.PENAL CODE ANN. § 39.06 (West 2011).[11] The indictment against Galle alleged that she, a public servant, namely Quality Control/Utilization Review for the Winkler County Hospital, and with intent to harm Dr. Rolando Arafiles, used for a non-governmental purpose information to which she had access because of her employment, and which information had not been made public, and forwarding such information to another. The indictment against Mitchell was identical except it identified her as the Compliance Officer for Winkler County Hospital. The State, represented by Tidwell, later amended the indictment against Mitchell. The amended indictment alleged that Mitchell, as a public servant, namely, Compliance Office for the Winkler County Hospital, and with intent to harm as set forth in Texas Penal Code § 1.07(25) Dr. Rolando Arafiles, used for a non-governmental purpose, such purpose being to harass, torment, annoy, or cause financial loss or injury to Dr. Rolando Arafiles, information to which Mitchell had access because of her employment, and which information had not been made public, and forwarding such information to another namely the Texas Medical Board by anonymous complaint.

*The TMB's Response to the Indictments*

The TMB became aware of the indictments within the next few days. On June 15, 2009, Mari Robinson, the Executive Director of the Texas Medical Board, telephoned Fostel and Tidwell to determine whether the indictments were based solely on the nurses' act of filing a complaint with the TMB. Robinson is a licensed Texas attorney. Robinson told Fostel that the TMB was concerned about the indictments brought against Mitchell and Galle and she wanted to first clarify that the TMB is a governmental agency. She also asked Fostel whether the nurses

---

[11] A public servant commits misuse of official information if, with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that: (1) he has access to by means of his office or employment; and (2) has not been made public. TEX.PENAL CODE ANN. § 39.06(b). The TMB is HIPAA exempt.

- 15 -

had been charged simply because they filed a complaint with the TMB or was there other evidence of which she was unaware. Fostel refused to discuss the matter with Robinson and told her that a copy of his entire file would be turned over to defense counsel and she could get whatever information she needed from the nurses' lawyers. Robinson telephoned Tidwell and expressed the same concerns. Tidwell responded that he did not need her to explain the law to him and he "understood exactly what he was doing." Like Fostel, Tidwell refused to discuss the case with Robinson and told her that she sounded like defense counsel for the nurses. In Robinson's opinion, Tidwell seemed to be more informed about the case than Fostel.

Dissatisfied with the prosecutors' responses and after being provided a copy of the State's file by the nurses' lawyers, Robinson sent a four-page letter, dated June 17, 2009, addressed to both Fostel and Tidwell. A copy of the letter was also sent to various state offices and officials, including the Executive Director of the Texas Board of Nursing, the Texas State Department of Health Services, the Office of the Governor, and the Attorney General. The letter outlined the TMB's concerns about the indictments and prosecution of Mitchell and Galle for filing an anonymous complaint with the TMB. First, Robinson took issue with the allegation in the indictment that the complaints filed against Dr. Arafiles were for a non-governmental purpose. She advised Tidwell that information provided to the TMB by an individual, either as a complaint against a licensee or in conjunction with an investigation by the TMB, is information used by the TMB in its governmental capacity as a State agency. She specifically stated that a complaint filed with the TMB is for a governmental purpose--the regulation of the practice of medicine. Robinson also informed Tidwell that any complaint filed with the TMB is both privileged and confidential. She expressed her concern that the firing of the nurses and the indictments brought against them had adversely impacted the TMB's investigation of

Dr. Arafiles and had potentially created a chilling effect on the cooperation of any other hospital personnel who might have been able to provide additional information needed to complete the investigation. The letter also requested any information from Tidwell as to whether Dr. Arafiles had engaged in any activity designed to intimidate witnesses or the complainants because such activity violated the Medical Practice Act.

Tidwell responded in writing to Robinson. He acknowledged that a complaint filed with the TMB was for a governmental purpose, but asserted that a complaint could be made for more than one purpose and he intended to let a jury decide whether the complaints had been made for something other than a governmental purpose. With respect to Robinson's request for information regarding witness intimidation, Tidwell asserted that Dr. Arafiles, to his knowledge, had acted appropriately in response to the complaints being filed against him.

*The Nurses are Prosecuted by Tidwell*

Fostel appeared in the courtroom during a pretrial hearing in August 2009, but Tidwell actually handled the hearing as well as the subsequent pretrial hearings.[12] Tidwell dismissed the case against Galle one week before Mitchell's case went to trial. Following a change of venue from Winkler County to Andrews County, Tidwell asked John Pool, the Andrews County Attorney, to assist him with jury selection. Pool agreed and Tidwell discussed the cases against Mitchell and Galle with him. After hearing the evidence, Pool told Tidwell that he did not have a case because there was no evidence that the complaint had been filed for a non-governmental purpose. Tidwell told Pool that the TMB was a State agency and he did not have any evidence that the information in the complaint was false. Based on their discussions, Pool told Tidwell

---

[12] When Fostel developed significant health problems which caused him to be absent often from the District Attorney's Office during this time period, Tidwell would act for him. In 2009-2010, Tidwell handled many cases and hearings for Fostel. On December 27, 2010, Tidwell filed a petition to remove Fostel from the office of the District Attorney. An affidavit attached to the petition stated that Fostel had not appeared before a grand jury since March of 2009.

before trial he should dismiss the case against Mitchell.

Tidwell did not dismiss the case and he represented the State at the trial of Mitchell's case in February of 2010. Fostel was not present at the trial. Pool was present during trial and he told Tidwell after jury selection that he should dismiss the case against Mitchell. Tidwell responded that Pool had not heard the evidence yet. As the trial progressed, Pool continued to tell Tidwell he did not have a case against Mitchell and he should dismiss it. Tidwell argued to Pool that he had evidence Mitchell had called Dr. Arafiles a "witch doctor," but Pool told him that her personal feelings about Dr. Arafiles or her subjective intent in filing the complaint was irrelevant because her act of filing the report with the TMB was for a governmental purpose. Tidwell did not dismiss the case. The jury acquitted Mitchell.

### *The Hospital is Disciplined*

The Hospital is a participant in the Medicare program and is required to comply with the conditions of participation established by the Social Security Act. On September 9, 2009, the Texas Department of State Health Services cited the Hospital for a number of deficiencies. Many of the deficiencies are related to the problems identified by Warren, Galle, and Mitchell. In one case, a patient had a gastrointestinal bleed and waited at the ED for nearly three and a half hours before being transferred to a facility with a higher level of care. The patient died at the accepting hospital. In another case, Dr. Arafiles treated a patient's MRSA infection with "oxygenated olive oil" which is not FDA approved or listed on the facility's formulary. DSHS also cited the Hospital for violating the statutes which prohibited termination of Galle's and Mitchell's employment for reporting violations to the administrator and the TMB.[13] On April 12, 2010, the DSHS imposed administrative penalties against the Hospital.

---

[13] A hospital, mental health facility, or treatment facility may not suspend or terminate the employment of an employee for reporting a violation of law to the employee's supervisor, an administrator of the facility, a state

- 18 -

*Dr. Arafiles is Disciplined*

The TMB filed a formal complaint against Dr. Arafiles on June 22, 2010. The complaint included nine allegations related to patient care and unprofessional conduct arising from witness intimidation of the nurses who had filed the complaints against him.

On February 4, 2011, the TMB entered a mediated agreed order finding that Dr. Arafiles committed witness intimidation and violated the standard of care in multiple cases. His license was suspended but he was placed on probation for a period of four years.

*Tidwell, Roberts, and Wiley are Indicted and Convicted*

A grand jury subsequently indicted Wiley for two felonies and abuse of official capacity, a misdemeanor.[14] Pursuant to a plea bargain, Wiley entered a plea of guilty to abuse of official capacity and was sentenced to serve thirty days in jail. As part of the plea bargain, Wiley agreed to testify truthfully if called as a witness. Roberts was convicted of misuse of official information (two counts), retaliation (two counts), and official oppression, and he was removed from office by operation of law. A jury found Tidwell guilty of misuse of official information (two counts), retaliation (two counts), and official oppression (two counts). This appeal follows.

## MISUSE OF OFFICIAL INFORMATION

In Issues One and Two, Tidwell challenges the sufficiency of the evidence supporting his convictions of misuse of official information (Counts 1 and 2). The trial court's charge permitted the jury to find Tidwell guilty of Counts 1 and 2 either acting alone or as a party with Sheriff Roberts.

---

regulatory agency, or a law enforcement agency. TEX.HEALTH & SAFETY CODE ANN. § 161.134(a)(West 2007).

[14] *See* TEX.PENAL CODE ANN. § 39.02.

*Standard of Review*

The legal sufficiency of the evidence to support a conviction is measured by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010). Under that standard, a reviewing court views all the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex.Crim.App. 2012); *Brooks*, 323 S.W.3d at 894-95, *citing Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. As the trier of fact, the jury is the sole judge as to the weight and credibility of witness testimony, and therefore, on appeal we must give deference to the jury's determinations. *Brooks*, 323 S.W.3d at 894-95. If the record contains conflicting inferences, we must presume the jury resolved such facts in favor of the verdict and defer to that resolution. *Id*. On appeal, we serve only to ensure the jury reached a rational verdict, and we may not reevaluate the weight and credibility of the evidence produced at trial and in so doing substitute our judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App. 2000). The sufficiency standard is the same for both direct and circumstantial evidence. *Wise*, 364 S.W.3d at 903.

*Elements of Misuse of Official Information*

Misuse of official information can be committed in various ways. *See* TEX.PENAL CODE ANN. § 39.06. The State charged Tidwell under Section 39.06(b) which provides that:

> (b) A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that:
>
> (1) he has access to by means of his office or employment; and
>
> (2) has not been made public.

In Section 39.06, "information that has not been made public" means any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code. TEX.PENAL CODE ANN. § 39.06(d). Chapter 552 of the Government Code is known the Public Information Act (formerly known as the Open Records Act). *See* TEX.GOV'T CODE ANN. §§ 552.001-.353 (West 2012).

Count 1 of the indictment alleged that Tidwell, on or about June 11, 2009, as a public servant, namely, Winkler County Attorney, and with intent to harm or defraud Anne Mitchell, used information for a nongovernmental purpose, which the defendant had access to by means of his office or employment and that had not been made public, to-wit: obtained non-public complaints filed with the Texas Medical Board through deception and used said complaints to identify the author of said complaint. Count 2 is identical except the victim is Vickilyn Galle.

*Information That Has Not Been Made Public*

In Issue One, Tidwell argues that the evidence is insufficient to prove that the complaint obtained from the TMB was information that had not been made public. Section 39.06(d)'s definition of information that has not been made public contains two components: (1) information to which the public does not generally have access; and (2) that is prohibited from disclosure under the Public Information Act (PIA). TEX.PENAL CODE ANN. § 39.06(d); *State v. Ford*, 179 S.W.3d 117, 122 (Tex.App.--San Antonio 2005, no pet.); *State v. Newton*, 179 S.W.3d 104, 108-09 (Tex.App.--San Antonio 2005, no pet.).

Tidwell does not challenge the first component but we will address it. Section 164.007(c) expressly provides that "[e]ach complaint, adverse report, investigation file, other investigation report, and other investigative information in the possession of or received or gathered by the board or its employees or agents relating to a license holder, an application for license, or a

- 21 -

criminal investigation or proceeding is privileged and confidential and is not subject to discovery, subpoena, or other means of legal compulsion for release to anyone other than the board or its employees or agents involved in discipline of a license holder." TEX.OCCUP.CODE ANN. § 164.007(c)(West 2012). The TMB provided the complaint to Sheriff Roberts based on his assertion that he was investigating two criminal offenses related to the complaint against Dr. Arafiles. *See* TEX.OCCUP.CODE ANN. § 164.007(h).[15] Information disclosed by the TMB to an investigative agency remains confidential and may not be disclosed by the investigating agency except as necessary to further the investigation. TEX.OCCUP.CODE ANN. § 164.007(h). Even though the TMB disclosed the complaint to Sheriff Roberts pursuant to Section 164.007(h), the complaint remained confidential. Thus, the public did not have access to this complaint. The first component of Section 39.06(d) has been satisfied and is supported by legally sufficient evidence.

Tidwell complains that the second component is not met because the PIA does not prohibit disclosure of the complaint filed with the TMB. As the San Antonio Court of Appeals noted in *Ford*, the purpose of the PIA is to provide public access to "complete information about the affairs of government and the official acts of public officials and employees." *Ford*, 179 S.W.3d at 123, *quoting* TEX.GOV'T CODE ANN. § 552.001(a). Public information must be made available to the public during normal business hours of the governmental body. TEX.GOV'T CODE ANN. § 552.021; *Ford*, 179 S.W.3d at 123. The Act defines "public information" as any information collected, assembled, or maintained under a law or ordinance or in connection with

---

[15] Section 164.007(h) provides: "The board shall cooperate with and assist a law enforcement agency conducting a criminal investigation of a license holder by providing information that is relevant to the criminal investigation to the investigating agency. Information disclosed by the board to an investigative agency remains confidential and may not be disclosed by the investigating agency except as necessary to further the investigation."

the transaction of official business by a governmental body or for a governmental body. TEX.GOV'T CODE ANN. § 552.002(a); *Ford*, 179 S.W.3d at 123.

In addressing the second component, the court observed in *Ford* that Section 39.06(d) uses the phrase "prohibited from disclosure under Chapter 552" but the PIA does not prohibit disclosure of any information. *Ford*, 179 S.W.3d at 123. The Act instead provides exceptions to required disclosure of public information. *Ford*, 179 S.W.3d at 123; *see* TEX.GOV'T CODE ANN. §§ 552.101-.142. If the two statutes are construed literally and without any attempt to harmonize them, the second component of Section 39.06(d) could never be satisfied and no one could ever be prosecuted or convicted under Section 39.06(c). This is contrary to the rules of statutory construction which require a court to construe statutory provisions in a manner that avoids illogical or absurd results. *State v. Green*, 287 S.W.3d 782, 784 (Tex.App.--Amarillo 2009, no pet.); *see Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App.1991)(stating that a court must construe a statute literally unless it leads to an absurd result); TEX.GOV'T CODE ANN. § 311.023(5)(West 2013)("In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the . . . consequences of a particular construction."). We agree that the phrase "prohibited from disclosure" in Section 39.06(d) contemplates the set of exceptions to disclosure contained in Subchapter C of the PIA. *Ford*, 179 S.W.3d at 123.

One of the exemptions from Section 552.021's public-disclosure requirement is information considered to be confidential by law, either constitutional, statutory, or by judicial decision. TEX.GOV'T CODE ANN. § 552.101. The complaint filed with the TMB is considered confidential by statutory law, and it remains confidential, even if disclosed to a law enforcement agency for purposes of investigation.

Tidwell argues, however, that the TMB failed to request an attorney general decision as provided for by Section 552.301 of the PIA, and therefore, the complaint is presumed to be subject to required public disclosure. He reasons that the TMB's voluntary disclosure of the complaint under these circumstances made the information public rather than prohibited from disclosure. Tidwell's reliance on Section 552.301 is misplaced for three reasons. First, Sheriff Roberts did not request the complaint under the PIA. He requested it pursuant to Section 164.007(h). Therefore, Section 552.301 is inapplicable. Second, the TMB did not seek to withhold the complaint from Sheriff Roberts. Section 552.301 applies only when a governmental body wishes to withhold public information. Third, even if Sheriff Roberts had requested the information pursuant to the PIA and the TMB had failed to submit a request to the attorney general for an opinion, the confidentiality requirement in Section 164.007(h) would constitute a compelling reason to withhold the information. *See* TEX.GOV'T CODE ANN. § 552.302 ("If a governmental body does not request an attorney general decision as provided by Section 552.301 . . . the information requested in writing is presumed to be subject to required public disclosure and must be released unless there is a compelling reason to withhold the information."); *Texas State Board of Veterinary Medical Examiners v. Giggleman*, 408 S.W.3d 696, 699 n.9 (Tex.App.--Austin 2013, no pet.h.)("Although the Board failed to submit its request by the ten-day deadline imposed by PIA section 552.301, *see* TEX.GOV'T CODE § 552.301 (b), such failure did not automatically require it to release the information because the confidentiality requirement imposed by Occupations Code section 807.027(b) would, if established, constitute a 'compelling reason to withhold the information.'").

Tidwell next contends that the complaints were properly released to Sheriff Roberts pursuant to Section 164.007(h) because he was conducting a criminal investigation of "the doctor

and/or the two nurses," and therefore, the PIA does not prohibit their disclosure. Section 164.007(h) authorizes release of information relevant to a criminal investigation of a license holder of the TMB. The nurses who were the subject of the investigation are not licensed by the TMB and the TMB's letter, which accompanied the copy of the complaint, expressly informed Roberts that the TMB had released the information to him based on its understanding that Sheriff Roberts was "conducting a criminal investigation of a license holder of the TMB" and he agreed to maintain the confidentiality of the complaint. The TMB cautioned Sheriff Roberts that if these assumptions were incorrect, he was to notify the TMB immediately because it was not otherwise authorized to provide the confidential information to him. Roberts never notified the TMB that he had made the request to determine who had filed the anonymous complaint against Dr. Arafiles or that he was investigating whether the nurses had committed a criminal offense by filing the complaint. Roberts was not authorized to receive a copy of the complaint in order to investigate the nurses or anyone other than a license holder of the TMB.

Tidwell does not cite to any evidence in the record supporting his assertion that Sheriff Roberts was investigating Dr. Arafiles for harassment of himself and misuse of official information. Sheriff Roberts testified at trial that he considered Dr. Arafiles the complainant in the investigation, not the suspect. He did not believe Dr. Arafiles had filed the complaint against himself with the TMB, but he added that there was a "small, minute chance" that he had done so and his investigation was open to that possibility. The jury was not required to believe Sheriff Roberts' testimony that he was investigating Dr. Arafiles for harassing himself.

We conclude that the evidence is legally sufficient to establish that the complaints obtained from the TMB had not been made public because it is information to which the public does not generally have access and it is prohibited from disclosure under the Public Information

Act. We overrule Issue One.

*Information Used for a Nongovernmental Purpose*

In Issue Two, Tidwell challenges the sufficiency of the evidence supporting the element that he used the information for a nongovernmental purpose. He argues that the complaint was used for a governmental purpose, namely, to investigate and prosecute the two nurses for misuse of official information.

Tidwell's argument is made without reference to the specific allegations in the indictment, the application paragraph of the court's charge, or the hypothetically correct jury charge. The indictment did not allege that Tidwell used the complaints to investigate and prosecute Mitchell and Galle. It alleged that he obtained non-public complaints filed with the Texas Medical Board through deception and used those complaints to identify the author. His brief focuses exclusively on his own use of the complaints to investigate and prosecute the nurses, and he does not specifically address the sufficiency of the evidence to support his conviction as a party.

The court's charge instructed the jury on the law of parties and permitted the jury to convict Tidwell either acting alone or as a party to Sheriff Roberts' commission of the offenses alleged in Counts 1 and 2. The application paragraph related to Count 1 stated:

> Now, if you find from the evidence beyond a reasonable doubt that on or about June 11, 2009, in Winkler County, Texas, the defendant, Scott Tidwell, either acting alone or with Robert Roberts as a party to the offense, as that term is herein defined, did then and there, as a public servant, namely, Winkler County Attorney, and with intent to harm or defraud Anne Mitchell, use information for a non-governmental purpose: to-wit: obtained a non-public complaint filed with the Texas Medical Board through deception and used said complaint to identify the author of said complaint, which the defendant, had access to by means of his office or employment and that had not been made public, and that he used said complaint to identify the author of said complaint or that he, Scott Tidwell, acting with the intent to promote or assist Robert Roberts in the commission of the offense of Misuse of Official Information solicited, encouraged, directed, aided or

attempted to aid the said Robert Roberts to commit said offense in the obtaining by Robert Roberts of a non-public complaint filed with the Texas Medical Board through deception, if he did, and used said complaint to identify the author of said complaint, then you will find defendant guilty of the offense of Misuse of Official Information as charged in Count One of the indictment.

The application paragraph related to Count 2 is identical except it identifies Vickilyn Galle as the victim and refers to Count 2 of the indictment.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex.Crim.App. 2011); *Hardy v. State*, 281 S.W.3d 414, 421 (Tex.Crim.App. 2009). A hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246. In this case, the trial court's charge accurately described the law, was authorized by the indictment, did not unnecessarily restrict the State's theories of liability, and adequately described the particular offense for which the defendant was tried.

The phrase "nongovernmental purpose" is not defined in Section 39.06 or elsewhere in the Penal Code. The trial court's charge did not define the phrase. Undefined statutory terms that have not acquired a technical meaning are interpreted according to their common usage. *Kirsch v. State*, 357 S.W.3d 645, 650 (Tex.Crim.App. 2012). According to Section 311.011 of the Texas Government Code, undefined terms shall be "construed according to the rules of grammar and common usage." TEX.GOV'T CODE ANN. § 311.011(a). Words and phrases that have acquired a technical or particular meaning must be construed accordingly. TEX.GOV'T CODE ANN. § 311.011(b). When analyzing the sufficiency of the evidence, undefined statutory terms "are to be understood as ordinary usage allows, and jurors may thus freely read statutory

language to have any meaning which is acceptable in common parlance." *Clinton v. State*, 354 S.W.3d 795, 800 (Tex.Crim.App. 2011), *quoting Vernon v. State*, 841 S.W.2d 407, 409 (Tex.Crim.App. 1992). But if those statutory terms have a technical meaning, they will be construed consistent with that technical meaning. *Clinton*, 354 S.W.3d at 800. The parties have not cited any authority indicating that the phrase "nongovernmental purpose" has a technical or specialized meaning and we have found none. Black's Law Dictionary does not define the term "nongovernmental" or the phrase "nongovernmental purpose." Webster's defines "purpose" as "the reason for which something exists or is done, made, or used, etc." Webster's New Universal Unabridged Dictionary 1570 (2003). In common parlance, the phrase "nongovernmental purpose" means an activity or function which is not related to or associated with a governmental function.

We begin by examining whether the evidence is sufficient to support Tidwell's conviction as a party. Tidwell has not challenged the jury's determination that Sheriff Roberts obtained the complaint from the TMB by deception and there is evidence to support that determination. The TMB released the complaint to Sheriff Roberts because it was deceived into believing that the sheriff was investigating Dr. Arafiles. The executive director of the TMB testified that she believed Sheriff Roberts was investigating Dr. Arafiles because that was the only name mentioned in the written request. The TMB made it clear in its cover letter to Roberts that it understood he was investigating a license holder of the TMB, and if this assumption was incorrect, he was required to notify the TMB immediately because it was not authorized to release the complaint to him for any other purpose. Roberts never notified the TMB that he was *not* conducting a criminal investigation of a license holder. Because Sheriff Roberts was not

authorized to obtain the privileged and confidential complaint, his use of it to identify the authors was for a nongovernmental purpose.

Taken in the light most favorable to the verdict, the evidence is also sufficient to prove beyond a reasonable doubt that Tidwell used the complaint for a nongovernmental purpose. It is undisputed that Sheriff Roberts disclosed the complaint to Tidwell. Sheriff Roberts clearly testified that he conducted a harassment investigation from the outset and it was Tidwell who concluded that filing an anonymous complaint with the TMB could constitute misuse of official information. Given that the letter Sheriff Roberts filed with the TMB asserted he was investigating both harassment and misuse of official information, the jury could have inferred that Tidwell was involved in making the request for the complaint. Under these facts, neither Roberts nor Tidwell was authorized to obtain the privileged and confidential complaint. The evidence is sufficient to support the jury's finding that Tidwell's use of the complaint to identify the authors was for a nongovernmental purpose. We overrule Issue Two.

**RETALIATION**

In Issues Three and Four, Tidwell contends that the evidence is legally insufficient to support his convictions of retaliation (Counts 3 and 4) because the evidence is insufficient to prove that he committed an unlawful act. A person commits the offense of retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a public servant, witness, prospective witness, or informant. TEX.PENAL CODE ANN. § 36.06. Count 3 of the indictment alleged that Tidwell, on or about June 11, 2009, intentionally or knowingly harmed Anne Mitchell to-wit: caused her to be investigated, indicted, arrested, seized, or prosecuted by an unlawful act, to-wit: the defendant's misuse of the official information of the Texas Medical Board, or the official

oppression of Anne Mitchell, in retaliation for or on account of the service or status of Anne Mitchell as a public servant or an informant or a prospective witness. Count 4 is the same as Count 3 except the victim is Vickilyn Galle. The application paragraph of the charge tracked the indictment except it identified the harm as causing Mitchell (Count 3) and Galle (Count 4) to be indicted, arrested, or prosecuted. The trial court's charge also defined the term "unlawful" as meaning criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege. *See* TEX.PENAL CODE ANN. § 1.07(48)(West Supp. 2012)(defining unlawful).

Tidwell maintains that his prosecution of Mitchell and Galle for misuse of official information was not an unlawful act because a grand jury returned indictments against them. Contrary to Tidwell's assertions on appeal, Counts 3 and 4 do not allege that the indictment, arrest, and prosecution of the nurses were unlawful. The indictment instead identifies the indictment, arrest, and prosecution of Mitchell and Galle as the harm inflicted on them in retaliation for or on account of the service or status of Mitchell and Galle as a public servant, informant, or prospective witness. Tidwell offers no argument with respect to the harm element of the indictment. Counts 3 and 4 identified Tidwell's unlawful act as his misuse of the official information of the TMB. As noted in our discussion of Issue Two, the evidence is legally sufficient to support Tidwell's conviction of misuse of official information. We conclude that the evidence is legally sufficient to prove that Tidwell committed an unlawful act. We overrule Issues Three and Four.

### OFFICIAL OPPRESSION

In Issues Five and Six, Tidwell challenges the sufficiency of the evidence supporting his convictions of official oppression. Similar to the argument made in Issues Three and Four,

Tidwell contends that the evidence is insufficient to prove that he knew his conduct was unlawful.

A public servant acting under color of his office or employment commits an offense if he intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful. TEX.PENAL CODE ANN. § 39.03(a)(1). Official oppression is a class A misdemeanor. TEX.PENAL CODE ANN. § 39.03(d). Counts 5 and 6 of the indictment alleged that Tidwell, on or about June 11, 2009, acting under color of his office, namely, Winkler County Attorney, intentionally subjected Anne Mitchell and Vickilyn Galle, respectively, to mistreatment, arrest and detention that he knew was unlawful. The pertinent application paragraphs of the court's charge tracked the indictment. The charge also defined the term "unlawful" as meaning criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege. *See* TEX.PENAL CODE ANN. § 1.07(48)(defining unlawful).

The critical question is whether the nurses' arrest and detention were unlawful as that term is defined by the Section 1.07(48) of the Penal Code and the jury charge. It is undisputed that Tidwell intentionally pursued indictments against Mitchell and Galle for filing an anonymous complaint with the TMB and those indictments resulted in their arrest and detention. Sheriff Roberts shared the documents in his investigation file with Tidwell and those documents included the TMB's cover letter which accompanied the copy of the complaint. That letter clearly advised that the document had been disclosed solely for use in the criminal investigation of a license holder of the TMB and the complaint could not be used for any other purpose. There is also evidence that Tidwell sought the indictments and prosecuted the nurses in retaliation for or on account of the nurses filing the complaint with the TMB and their service as a witness,

prospective witness, or informant in the TMB's investigation of Dr. Arafiles. The evidence is legally sufficient to support a finding by the jury that Tidwell's prosecution of Mitchell and Galle is criminal because it constituted retaliation in violation of Section 36.06. Issues Five and Six are overruled.

## PROSECUTORIAL IMMUNITY

Tidwell raises two issues based on his assertion that he has absolute immunity from criminal liability. In Issue Seven, he contends that the trial court erred by denying his motion to dismiss based on absolute prosecutorial immunity. In Issue Eight, he challenges the trial court's refusal to grant his request for an instruction in the jury charge on prosecutorial immunity.

In construing the doctrine of absolute immunity, Texas courts follow federal jurisprudence and apply the functional approach of *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). *Clawson v. Wharton County*, 941 S.W.2d 267, 271 (Tex.App.--Corpus Christi 1996, writ denied); *Font v. Carr*, 867 S.W.2d 873, 877 (Tex.App.--Houston [1st Dist.] 1993, writ dism'd w.o.j.). Government officials or actors have absolute immunity when the complained of activities were "intimately associated with the judicial phase of the criminal process." *Clawson*, 867 S.W.2d at 271, *quoting Font*, 867 S.W.2d at 877. Prosecutors have absolute immunity from liability when performing their prosecutorial functions. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Charleston v. Pate*, 194 S.W.3d 89, 90 (Tex.App.--Texarkana 2006, no pet.); *Font v. Carr*, 867 S.W.2d 873 (Tex.App.--Houston [1st Dist.] 1993, writ dism'd w.o.j.); *Miller v. Curry*, 625 S.W.2d 84, 86–87 (Tex.App.--Fort Worth 1981, writ ref'd n.r.e.). Absolute immunity protects a prosecutor even if the prosecutor acts in bad faith or with ulterior motives, so long as he or she acts within the scope of his or her prosecutorial functions. *Charleston*, 194 S.W.3d at 90; *Clawson*, 941 S.W.2d at 272.

Tidwell concedes that he has found no cases applying the doctrine of absolute immunity to prohibit a criminal prosecution. The United States Supreme Court recognized in *Mireles v. Waco* that a judge is not absolutely immune from criminal liability. *Mireles v. Waco*, 502 U.S. 9, 10 n.1, 112 S.Ct. 286, 287, 116 L.Ed.2d 9 (1991), *citing Ex parte Virginia,* 100 U.S. 339, 348-49, 25 L.Ed. 676 (1880). In the absence of any authority to support such a decision, we decline to extend the doctrine of absolute immunity to shield Tidwell from criminal prosecution for conduct committed in the course of a criminal prosecution. Concluding that the trial court did not err by denying the motion to dismiss or by refusing to submit an instruction on prosecutorial immunity, we overrule Issues Seven and Eight.

### *RES JUDICATA* AND COLLATERAL ESTOPPEL

In Issue Nine, Tidwell challenges the trial court's denial of his motion to dismiss the indictment based on the concepts of *res judicata* and collateral estoppel. He argued in the trial court that the charges against him should be dismissed because certain issues were litigated during pretrial hearings in the Mitchell and Galle cases. We understand Tidwell to argue that because the judge presiding over Mitchell's and Galle's criminal cases denied their motions to dismiss based on prosecutorial misconduct, the issues addressed in these motions have been determined in his favor and the indictment against him should have been dismissed.

The doctrine of *res judicata* involves the conclusive effects of judgments, encompassing two separate categories: (1) claim preclusion (usually referred to as *res judicata*) and (2) issue preclusion (usually termed collateral estoppel). *Barr v. Resolution Trust Corp. ex rel. Sunbelt Federal Savings*, 837 S.W.2d 627, 628 (Tex. 1992). Claim preclusion prohibits a second suit based on the same claim between the same parties. *York v. State*, 342 S.W.3d 528, 553 (Tex.Crim.App. 2011)(Womack, J., concurring); *Barr*, 837 S.W.2d at 628 (claim preclusion

prevents the relitigation of a claim or cause of action that has been finally adjudicated, as well as related matters that, with the use of diligence, should have been litigated in the prior suit). Issue preclusion prohibits a party from relitigating an issue (such as a fact, a question of law, or an application of law to fact) that was previously determined in a suit between the same parties. *York*, 342 S.W.3d at 553 (Womack, J., concurring); *Barr*, 837 S.W.2d at 628 (issue preclusion prevents relitigation of particular issues already resolved in a prior suit). *Id.*

In the criminal law context, claim preclusion has been subsumed by the Fifth Amendment prohibition of double jeopardy. *York*, 342 S.W.3d at 553 (Womack, J., concurring). The doctrine of collateral estoppel, or issue preclusion, is embodied within the Double Jeopardy Clause of the Fifth Amendment, which is applicable to the states through the Fourteenth Amendment. *Murphy v. State*, 239 S.W.3d 791, 794 (Tex.Crim.App. 2007), *citing Ashe v. Swenson*, 397 U.S. 436, 445, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). While double jeopardy protects a defendant against a subsequent prosecution for an offense for which the defendant has been acquitted, collateral estoppel deals only with relitigation of specific fact determinations. *Murphy*, 239 S.W.3d at 794. Collateral estoppel means "that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit relating to the same event or situation." *Id.*, *quoting Ashe*, 397 U.S. at 443, 90 S.Ct. at 1189.

The constitutional protection against double jeopardy is inapplicable in this case because Mitchell and Galle, not Tidwell, were the defendants in the prior prosecutions. Issue preclusion does not apply either because Tidwell was not a party to the prior litigation. A criminal defendant cannot rely on collateral estoppel to bar relitigation of a particular fact in a subsequent proceeding unless he was a party to the previous proceeding. *See State v. Cotto*, 305 S.W.3d

420, 422 (Tex.App.--El Paso 2010, no pet.).  Issue Nine is overruled.  Having overruled Issues

One through Nine, we affirm the judgment of the trial court.


December 4, 2013
                                        ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

(Do Not Publish)